THE PEOPLE OF THE TERRITORY OF UTAH, RESPONDENT, v. DANIEL KESSLER, APPELLANT.

RES GESTÆ—CONFESSION—ALIBI.

1. The defendant was found guilty of murder in the second degree, and sentenced to imprisonment. It appeared from the evidence that, when one Niebergall was in the house of Mrs. Binkley of Salt Lake City, he was shot in the abdomen at about 15 minutes before 11 o'clock p. m., from which he died on the 27th of the same month. The neighbors heard scuffling in the house, three shots fired, and Niebergall jumped through the window into the back yard, hallooing that he was shot, and calling for help. After he had lain where he fell for 20 or 30 minutes, he was carried into the house and laid on a bed. While there Capt. Donovan, a police officer, came into the room and asked him who shot him, to which he replied, that he was not a "squealer." But, when Donovan insisted upon the information, he said· a man known as "Doc" shot him; that Doc" was with Mrs. Binkley; that he was an old man with a gray head, and about six feet high. It appeared from the evidence that the defendant was called "Doc," and that he answered the description given. This conversation occurred between forty-five minutes and one hour and a quarter after the attack on Niebergall had ceased, and he had jumped through the window,—after the transaction had closed. *Held*, that it was

error to admit the statements of Niebergall as a part of the *res gestœ.* These were not spontaneous expressions of the impulses and motives of the shooting, or its surroundings; the cry for help, that he was shot, was. The first statement, that he was not a "squealer," certainly did not emanate from the impulses of the struggle; and after the policemen admonished him, he changed his mind and made the statements from memory, and not from impulses and motives of the conflict, more than forty-five minutes before. These statements were not contemporaneous with, and were not so connected with the conflict as to authorize them to be received as part of the *res gestœ.* The case of *Linderberg* v. *Mining Co.,* 33 Pac. 692, 9 Utah 163, is overruled, so far as it conflicts with the law upon the subject of *res gestœ* announced in this opinion.

2. On the night he was shot, deceased was taken to Ft. Douglas, a distance of two or three miles, and on the next day Chief Pratt and Capt. Donovan took the defendant into the room in which the deceased was. Donovan was permitted to testify what was said, against the objection of the defendant, as follows: "Pratt said to him: 'This is Chief Donovan. Do you know him?' To which Niebergall made no reply, but he looked around and fixed his eyes on defendant. The defendant shook his head, and Chief Pratt said to defendant, 'Just keep still.' And then Pratt asked him, 'Did you ever see this man before?' pointing out Kessler. And the deceased then said, 'Yes, sir; and he shot me like a rabbit.'" Acquiescence in a statement charging a man with crime may be inferred from his silence, when he is free to contradict it; but if the circumstances render a denial improper, no such inference follows. The silence must be voluntary. As the defendant probably inferred, from the command of the officer to keep still, that he was not to say anything, the evidence of this circumstance was improperly admitted.

3. It was not erroneous in the trial judge to charge the jury "that if the prosecution made out such a case by its proof as would sustain a verdict of guilty, then the burden is upon the defendant to establish an alibi by a preponderance of the evidence;" the jury being informed by the court that they should consider all the evidence, including that as to

the alibi, and if, from it all, they had a reasonable doubt of defendant's guilt, they should acquit him.

(No. 656.   Decided March 9, 1896.   44 P. R. 97.)

Appeal from the district court of the Third judicial district, Territory of Utah.   Hon. George W. Bartch, *Judge.*

The appellant was indicted for murder in the first degree by the grand jury of the Third judicial district of the Territory of Utah, on the first day of December, 1894.   He was tried under said indictment; and on the 19th day of said month the jury found him guilty of mur der in the second degree, with recommendations to mercy. Appellant's motion for a new trial was denied, and on the 2d day of May, 1895, the court rendered judgment against said appellant and sentenced him to imprisonment at hard labor for fourteen years.

Appeal from an order denying the motion for a new trial, and from the judgment.   Reversed.

In addition to the statement of facts contained in the opinion, the deceased was allowed to testify at the time of his conversation with Captain Donovan, soon after the shooting, as follows:  "I was dazed; that is the reason I jumped through the window.   The doctor ran out through the kitchen door.   An old lady followed him out, and I think it was Mrs. Binkley.   She screamed and I recognized her voice.   I am acquainted with Dr. Kessler.   I met him twice at Mrs. Binkley's house and once at the Salvation Army barracks."

*H. B. Edler*, for the appellant.

The twelfth error complained of is that the court erred in charging the jury as follows:

"The defendant in this case claims that at the time when the fatal shot was fired, he was at a different place, and that he could not have committed the crime. This is what is known in law as an alibi; and as to that I charge you, that if the prosecution made out such a case by its proof as would sustain a verdict of guilty, then the burden is upon the defendant to prove this defense by a preponderance of the evidence."

The defendant is not compelled to show his absence by a preponderance of the evidence; this would be, in effect, compelling him to establish his innocence. It eliminates the idea of a reasonable doubt, and throws the burden of proof upon the defendant.

The commission of a criminal offense implies, of course, the presence of the defendant at the necessary time and place. Proof of an alibi is, therefore, as much of a traverse of a crime charged as any other defense, and proof tending to establish it, though not clear, may nevertheless, with other facts, raise doubt enough to produce an acquittal.

In one place the court charges the jury that if they had a reasonable doubt of defendant's guilt they must acquit. Let us see in what position these two instructions left the defendant. The one on reasonable doubt required the jury to acquit him if they had a reasonable doubt from all the evidence; but the one on alibi—his only defense— required them to acquit on that only, if they found that defense to be true. Could two instructions be more inconsistent and irreconcilable?

For a thorough analysis on this point the attention of the court is directed particularly to the case of *State* v. *Taylor*, 24 S. W. 449. *Prince* v. *State*, 14 So. 409; *Johnson* v. *State* (1886), 21 Tex. app. 368, 17 S. W. 252; *State* v. *Toler*, 16 Ohio St. 538; *Pollard* v. *State*, 53 Miss. 537; *Miller* v. *People*, 39 Ill. 457; *Watson* v. *Com.*, 95 Pa. St. 408;

*Chapple* v. *St.*, 7 Cold. 92; *State* v. *Harden*, 46 Iowa 623; *State* v. *James*, 78 N. C. 504; *People* v. *Fong Ah Sing*, 64 Cal. 253, 28 Pac. 233; *Murphy et al.* v. *State*, 12 So. 453; *Cyres* v. *State*, 17 S. W. 253.

United States Attorney, for respondent. No brief on file.

ZANE, C. J.:

It appears from the record in this case that a jury found the defendant guilty of murder in the second degree; that the court entered a judgment of conviction, sentencing him to imprisonment in the penitentiary at hard labor for the term of 14 years, and denied his motion for a new trial; and that he has appealed from that order and judgment to this court. It also appears that Frederick Niebergall, the deceased, was a soldier in the service of the United States; that on the night of the 22d of November, 1894, when in the house of Mrs. Binkley in Salt Lake City, he was shot in the abdomen, at about 15 minutes before 11 o'clock, from which he died on the 27th day of the same month. The evidence as to whether the defendant was at the house at the time is conflicting. The neighbors heard scuffling in the house, three shots fired, and Niebergall jumped through the window into the back yard, hallooing that he was shot, and calling for help. After he had lain where he fell 20 or 30 minutes, he was carried into the house, and laid on a bed. While there, Capt. Donovan, a police officer, came into the room, and asked him who shot him, to which he replied that he was not a "squealer." But when Donovan insisted upon the information, he said that a man known as "Doc" shot him; that "Doc" was with Mrs. Binkley; that he was an old man, with a gray head, and about six feet high. It appears, from the evidence, that the defendant was called

"Doc," and that he answered the description given. This conversation occurred between forty-five minutes and one hour and a quarter after the attack upon Niebergall had ceased, and he had jumped through the window,—after the transaction had closed. A witness was permitted to testify to this conversation against the objection of the defendant. The ruling of the court permitting it to go to the jury was excepted to, and assigned as error.

These statements of the deceased were not competent as dying declarations, and were not offered as such. They were offered and admitted as part of the *res gestæ*. This assignment of error presents the first question for our consideration and decision. If the homicide of Niebergall was murder, the act of shooting him, with the intent from which it proceeded, made it so. From the act alone the law would infer malice and murder. But other acts during the struggle, and before and after the shooting, with the accompanying language, might explain the act of killing, or show that it was a mere accident, or that it was in self-defense, or that it proceeded from passion, without malice, and was therefore manslaughter, or that the intent was formed in such haste, and amid such confusion, and was so indistinct, as to be murder in the second degree, or was so deliberate and distinct as to make it murder in the first degree. Hence, all the physical acts of the parties engaged in the conflict, and all the expressions, verbal or otherwise, attending them, and all the motives, whether of malice, of passion, of fear, or desire, or otherwise indicated, constituted the *res gestæ*. The *res gestæ*, when viewed altogether, constituted a whole, though it may have been composed of many acts, expressions, and motives. A physical object may be composed of many parts, all of them together constituting a machine or other object. So the struggle or conflict may be composed of many parts, but altogether they consti-

tute a unit, and that unit is the *res gestœ*. Niebergall had received the fatal wound, and had jumped out of the window, hallooing that he was shot, and calling for help, and his assailant had fled, and the struggle and strife had ended 45 minutes before the conversation between Donovan and Niebergall commenced. The attack had ceased, Niebergall had escaped out of the window, and the defendant had fled out of sight and hearing. The scuffling, the shooting, the jumping out of the window, and the hallooing of Niebergall that he was shot, and calling for help,—all the acts of violence and efforts to escape, and the language that accompanied such acts,— ceased when Niebergall fell exhausted in the yard. When the deceased was first asked by Donovan who shot him, he said that he was not a "squealer"; and when admonished that he ought to tell, he said that "Doc" shot him, and he then said that "Doc" was with Mrs. Binkley, and he then described "Doc." These were not the spontaneous expressions of the impulses and motives of the shooting, or its surroundings; the cry for help, and that he was shot, was. The first statement, that he was not a "squealer," certainly did not emanate from the impulses of the struggle; and, after the policeman admonished him, upon reflection, he changed his mind, and made the statements from memory, and not from the impulses and motives of the conflict, more than 45 minutes before. The conversation was purely upon reflection, from his memory, at the time it occurred. He then recalled whom he saw and what occurred, and gave the name by which the man was known who shot him, and a description of him. This certainly did not proceed from the impulses and motives in operation at the time he was shot. These statements were not contemporaneous with, and were not so connected with, the conflict, as to authorize them to be received as a part of the *res gestœ*. The rule is stated in

the first volume of Greenleaf on Evidence as follows (section 10): "It is to be observed that, where declarations offered in evidence are merely narrative of a past occurrence, they cannot be received as proof of the existence of such occurrence. They must be concomitant with the principal act, and so connected with it, as to be regarded as the mere result and consequence of the coexisting motives, in order to form a proper criterion for directing the judgment which is to be formed upon the whole conduct. On this ground, it has been holden that letters written during absence from home are admissible as original evidence, explanatory of the motives of departure and absence, the departure and absence being regarded as one continuing act." In this last illustration the principal act is continuing when the letter is written that explains and characterizes it.

The statements of Niebergall to Donovan were merely narrative of a past occurrence, and were not concomitant with it. The motives from which the statements to Donovan proceeded did not coexist with the scuffling, the shooting, and the jumping out of the window, or the motives from which those acts proceeded. The motive of Niebergall in the scuffle was probably mere passion, or a desire to defend himself, and a wish to get away from the man that was shooting at him caused him to jump out of the window, and a wish for assistance and protection was his motive in hallooing that he was shot, and calling for help; while his motive for giving the name to Donovan by hich the man was known, and a description of him, was that he might be brought to justice for his crime, in all probability. The case of *Waldele* v. *Railroad Co.*, 95 N. Y. 275, is in point. This action was by the administratrix to recover damages for the death of one Waldele, who, while crossing the defendant's track, at night, on his way home, received an injury from a passing train

which proved fatal in a few hours. After he had been removed to the sidewalk, and about 30 minutes after the injury, he told how it occurred. The ruling of the trial court, admitting this statement in evidence, the court of appeals held erroneous, and with other language used the following: "The claim that the declarations can be treated as part of the *res gestæ* is not supported by authority in this state. The *res gestæ*, speaking generally, was the accident. These declarations were no part of that,—were not made at the same time, or so nearly contemporaneous with it as to characterize it or throw any light upon it. They are purely narrative, giving an account of a transaction, not partly past, but wholly past and completed. They depend for their truth wholly upon the accuracy and reliability of the deceased, and the reliability of the witnesses who testified to them."

In the case of *Reg.* v. *Bedingfield*, the defendant was indicted for the murder of a woman at Ipswich, against whom he had received a violent resentment. He came to her house early in the morning, and went into the room where she was. In a minute or two the deceased came suddenly out of the house, towards two women in the yard, with her throat cut, and on meeting one of them, she said something, pointing backwards to the house. In a few minutes she was dead. In the course of the opening speech on the part of the prosecution, it was proposed to state what she said. It was objected to, on the part of the prisoner, that it was not admissible; and Cockburn, C. J., said he had carefully considered the question, and was clear that it could not be admitted, and therefore ought not to be stated, as it might have a fatal effect. "I regret," he said, "that according to the law of England, any statement of the deceased should not be admissible. Then could it be admissible, having been made in the absence of the prisoner, as part of the *res gestæ*; but it is

not so admissible, for it was not part of anything done, or something said while something was being done, but something said after something done. It was not as if, while being in the room, and while the act was being done, she had said something which was heard." 14 Cox, Cr. Cas. 341, also found in Thayer, Cas. Ev. p. 650.

This ruling of the chief justice being criticised, he published a pamphlet in which he discussed the subject of *res gestæ* at considerable length. In the course of his discussion, the chief justice gives the following definition of the term *res gestæ:* "Whatever acts or series of acts constitute, or in point of time immediately accompany and terminate in, the principal act charged as an offense against the accused, from its inception to its consummation or final completion, or its prevention or abandonment, whether on the part of the agent or wrongdoer in order to its performance, or on that of the patient or party wronged in order to its prevention, and whatever may be said by either of the parties during the continuance of the transaction with reference to it, including herein what may be said by the suffering party, though in the absence of the accused, during the continuation of the action of the latter, actual or constructive (e. g. in the case of flight or application for assistance), form part of the principal transaction, and may be given in evidence as part of the *res gestæ*, or particulars of it; while, on the other hand, statements made by the complaining party, after all action on the part of the wrongdoer, actual or constructive, has ceased, through the completion of the principal act, or other determination of it by its prevention, or its abandonment by the wrongdoer (such as, e. g. statements made with a view to the apprehension of the offender), do not form part of the *res gestæ*, and should be excluded."

In this the chief justice said, in substance, that whatever acts immediately accompany the principal act, from

its inception to its end by either party, and whatever is said by either during the continuance of the transaction, including what is said by the suffering party in the absence of the accused, during the continuance of the action of the accused, actual or constructive, as in case of flight or application for assistance, form part of the *res gestæ*; while statements made by the complaining party, after all action by the wrongdoer, actual or constructive, has ceased, such as statements made with a view to apprehension, do not form part of the *res gestæ*. This definition includes the flight of either party and application for assistance, and excludes statements made after all action by the wrongdoer has ceased with a view to the apprehension of the offender. We think that a fair application of this rule would have admitted the flight of the woman, with her throat cut, from her assailant into the yard, and what she said in her flight, rejected in the trial of Bedingfield.

The opinion of Mr. Justice Park, in the case of *Rawson* v. *Haigh*, 9 Moore 217, also found in Thayer, Cas. Ev. 637, has been referred to. The question was whether the act of the party in departing the realm constituted an act of bankruptcy. The justice said "that declarations made at the time of the departure, and during the absence of the party, were admissible in evidence to show the motive of such departure," and added that "the letters in question may be considered as having been written during the continuance of the act complained of,"—as Greenleaf says, *supra*, "the departure and absence being regarded as one continuing act." This is based on the assumption that human acts proceed from human motives, and that the motive characterizes and explains the act, and that what a person says with respect to an act while performing it is competent evidence to show the intent from which it proceeds, and to characterize it. But this prin-

ciple has no application to the question we are consider-
ing in this case.    All the acts of violence had ceased 45
minutes before the statements to Donovan were made.
Those statements accompanied no act or motive contem-
poraneous with the shooting of Niebergall.    Prof. Thayer
quotes the opinion of Mr. Justice Park, and adds this
note:    "This case, as reported in 2 Bing. 99, represents
Park, J., as making the following often-quoted remark,
which has contributed much to the confusion in the latter
case:    'It is impossible to tie down to time the rule as to
declarations.    We must judge from all the circumstances
of the case.    We need not go to the length of saying that
a declaration made a month after the fact would itself be
admissible; but if, as in the present case, there are con-
necting circumstances, it may even at that time form part
of the whole *res gestæ.*'"    This remark does not appear in
the opinion quoted.

The attorney general cites *Insurance Co.* v. *Mosley,* 8
Wall. 397, in support of the ruling of the court on the
point under consideration.    That action was upon a pol-
icy insuring the life of Arthur H. Mosley, containing a
provision that the insurance should not extend to any
injury arising from natural causes.    And to prove that he
died from the effects of an accident his widow was
allowed to testify, against the objection of the company,
that the assured had left his bed between 12 and 1 o'clock
at night, and  when he came back, "he said he had fallen
down the back stairs; almost killed himself; that he had
hit the back part of his head in falling down stairs.    She
noticed that his voice trembled, he complained of his
head, and appeared to be faint, and in great pain."    The
son of the assured was also permitted to testify, against
the objection of the company, "that he slept in the lower
part of the building occupied by his father; that, at about
12 o'clock of the same night, he saw his father lying with

his head on the counter, and asked him what was the matter. He replied that he had fallen down the back stairs, and hurt himself very much." To this ruling of the court the defendant in error excepted. There was no other evidence to the alleged accident than the testimony of the widow and son. From this opinion Justices Clifford and Nelson dissented. It does not appear precisely how soon after the injury the statements were made to the witnesses. It must have been some minutes. The remark of Mr. Justice Park, referred to by Prof. Thayer, is quoted in this opinion. It has been very much criticised, and the supreme court refused to follow it in the later case of *Railroad Co.* v. *O'Brien*, 119 U. S. 99, 7 Sup. Ct. 118. This later case was an action to recover damages by the plaintiffs in consequence of injuries to the wife (the plaintiffs being husband and wife), who was a passenger on the defendant's train, in consequence, as alleged, of the latter's negligence. On the trial of the case the court below permitted a witness to testify, against the objection of the company, as follows: "Between 10 and 30 minutes after the accident occurred, I had such a conversation with Morgan Herbert, the engineer having charge of the locomotive attached to the train, at the time of the accident, and he told me that the train was moving at the rate of 18 miles an hour." To the admission of this testimony the defendant excepted. In view of other evidence, the supreme court was of the opinion that the declaration of the engineer may have had a decisive influence upon the result of the trial. In the opinion the court said: "We are of the opinion that the declaration of the engineer, Herbert, to the witness Roach, was not competent, against the defendant, for the purpose of proving the rate of speed at which the train was moving at the time of the accident. * * * His declaration, after the accident

13 UTAH—6

had become a completed fact, and when he was perform-ing the duties of engineer, that the train, at the moment the plaintiff was injured, was being run at the rate of 18 miles an hour, was not explanatory of anything in which he was then engaged. It did not accompany the act from which the injuries in question arose. It was, in its essence, the mere narrative of a past occurrence, not a part of the *res gestœ*, simply an assertion or representa-tion, in the course of conversation, as to a matter not then pending, and in respect to which his authority had been fully ended. It is not to be deemed part of the *res gestœ* simply because of the brief period intervening between the accident and the making of the declaration. The fact remains that the occurrence had ended when the declara-tion in question was made, and the engineer was not in the act of doing anything that could possibly affect it. If his declaration had been made the next day after the acci-dent, it would scarcely be claimed that it was admissible evidence against the company; and yet the circumstance that it was made between 10 and 30 minutes—an appre-ciable period of time—after the accident, cannot, upon principle, make this case an exception to the general rule. If the contrary view should be maintained, it would fol-low that the declaration of the engineer, if favorable to the company, would have been admissible in its behalf as part of the *res gestœ*, without calling him as a witness, a proposition that will find no support in the law of evi-dence." In a footnote the court cites a long list of authorities from various states in support of its opinion. The case of *Linderberg* v. *Mining Co*, 9 Utah 163, 33 Pac. 692, is overruled, so far as it conflicts with the law upon the subject of *res gestœ* announced in this opinion.

We are of the opinion that the ruling of the court admitting the witness to testify to the conversation between Niebergall and Donovan was erroneous. On the

night he was shot, the deceased was taken to Ft. Douglas, a distance of two or three miles, and on the next day Chief Pratt and Capt. Donovan took the defendant to the room in which the deceased was. Donovan was permitted to testify what was said, against the objection of the defendant, as follows: "Pratt said to him: 'This is Chief Donovan. Do you know him?' To which Niebergall made no reply, but he looked around, and fixed his eyes on defendant. The defendant shook his head, and Chief Pratt said to defendant, 'Just keep still.' And then Pratt asked him, 'Did you ever see this man before?' pointing out Kessler. And the deceased then said, 'Yes, sir; and he shot me down like a rabbit.'" This statement by Niebergall was not a dying declaration. It was offered as a statement made in the presence and hearing of the defendant. Confession of crime is competent evidence, if voluntary; otherwise, if induced by undue influence. So, acquiescence in a statement charging a man with crime may be inferred from his silence, when he is free to contradict it; but, if the circumstances render a denial improper, no such inference follows. The silence must be voluntary. If the silence is induced by undue influence, both the silence and the declaration should be rejected. Instead of being told by the officer in whose custody he was to keep still when Niebergall made the statements against him, he should have been told that he was at liberty to deny or admit it, according to the truth. Mr. Pratt may have wished to prevent the defendant from doing or saying anything to call the attention of Niebergall to him; but the defendant probably inferred, from the command of the officer to keep still, that he was not to say anything. We are of the opinion that the statement of Niebergall in the presence of the defendant, and the silence of the latter, should have been excluded from the jury.

The defendant excepted to the following portion of the charge of the court to the jury: "The defendant in this case, claims that, at the time when the fatal shot was fired, he was at a different place, and that he could not have committed the crime. This is what is known in law as an 'alibi'; and as to that I charge you that, if the prosecution made out such a case, by its proof, as would sustain a verdict of guilty, then the burden is upon the defendant to prove such defense by a preponderance of the evidence. The court also charged the jury that the law presumed the defendant innocent until proven guilty, and that, unless evidence before them established his guilt beyond a reasonable doubt, they should acquit him. The portion of the charge referred to announced, in substance, that, if the plaintiff's evidence established the defendant guilty beyond a reasonable doubt, the burden was upon the defendant to prove, by a preponderance of the evidence, that he was at another place at the time of the commission of the crime. The jury were informed by the court that they should consider all the evidence, including that as to the alibi; and if, from it all, they had a reasonable doubt of defendant's guilt, they should acquit him. We are of the opinion that the portion of the charge excepted to was not erroneous. *State* v. *Northrup*, 48 Iowa 583; *Ware* v. *State*, 67 Ga. 349; *Briceland* v. *Com.*, 74 Pa. St. 463; *People* v. *O'Neil*, 59 Cal. 259; *People* v. *Dillon*, 8 Utah 92, 30 Pac. 150; *People* v. *Tidwell*, 4 Utah 506, 12 Pac. 61.

We do not deem it necessary to consider the other errors separately. We do not regard them as well assigned. For the reasons stated in this opinion, the judgment and order of the lower court appealed from are reversed, and the cause is remanded, with directions to that court to grant a new trial.

MINER, J., and HILES, District Judge, concur.