THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RAY PFANSCHMIDT, Plaintiff in Error.

*Opinion filed February 21, 1914—Rehearing denied April 14, 1914.*

1. CRIMINAL LAW—*discretion of judge on motion for change of venue is subject to review by courts.* An application for a change of venue on account of the prejudice of the inhabitants of the county is addressed to the sound legal discretion of the trial judge, but this discretion is not arbitrary and is subject to review by the courts in case of its abuse.

2. SAME—*an abuse of discretion does not mean only a decision from whim or caprice or bad motive.* Abuse of discretion by the trial judge on application for a change of venue does not mean only a decision based on whim or caprice or made from a bad motive, but also a decision where the discretion of the judge has not been justly and properly exercised under the circumstances.

3. SAME—*decision on motion for change of venue does not depend upon number of affidavits.* The proper decision of a motion for a change of venue cannot be made on the basis of the number of affidavits on each side or by mere preponderance of testimony.

4. SAME—*change of venue should be granted on showing which raises a reasonable apprehension that accused cannot receive fair trial.* One applying for a change of venue in a criminal case on the ground of prejudice of the inhabitants is not required to show, beyond a reasonable doubt or by a preponderance of the evidence, that he cannot receive a fair and impartial trial, but the change of venue should be granted if the showing made is such as to raise a reasonable apprehension of that fact.

5. SAME—*when an application for a change of venue should be granted.* An application for a change of venue in a murder trial upon the ground of prejudice of the inhabitants of the county should be granted, where it appears that the atrociousness of the crime had aroused intense interest and bitter feeling toward the defendant; that large numbers of persons had publicly expressed belief in his guilt and advocated the death penalty; that defendant's attorneys had been publicly denounced for undertaking his defense; that a statement by the State's attorney had been published that a change of venue would cost the county $20,000, and that the sheriff had stated that a number of persons had asked for the privilege of springing the trap at the defendant's execution.

6. SAME—*case on trial at end of term need not be formally continued.* A criminal case, the trial of which has been begun before the close of the term, need not be included in an order of the court

continuing all pending and undetermined motions and adjourning court for the term, and in such case the new term at which the trial is resumed will not be regarded as the term at which the trial began, under the statute concerning the speedy trial of prisoners not admitted to bail.

7. SAME—*rule as to proof of admissions implied from silence of accused.* An admission may be implied from the conduct of a party in remaining silent when charged with crime or when statements are made in his presence affecting him, provided the circumstances afford him an opportunity to act or speak in reply and men similarly situated would naturally deny the implied guilt or make explanations or statements.

8. SAME—*damaging statements made to accused are not admissible if he did not adopt them.* Statements made by third persons to the accused charging him with crime or with actions implicating him therein are not admissible against him if he denies them, or refuses to answer because he is acting under the advice of counsel, or for any other valid reason.

9. SAME—*when accusations by grandfather of the accused are not admissible.* In a murder trial it is error to permit the aged grandfather of the accused to testify to conversations between the witness and the accused a week before the crime was committed and having no connection therewith, in which the witness testifies he said to the accused, "You are going to the dogs and going damned fast;" "You are going just where them dynamiters out in California are;" to which he testifies the accused made some reply but the witness did not know what he said.

10. SAME—*motive attributed to accused must have some legal or logical relation to the act.* The motive attributed to the accused in any case must have some legal or logical relation to the act, and evidence of other transactions involving suspicion or wrongdoing or of acts from which inferences of moral turpitude may be drawn, which have no bearing on the main fact to be proved or to the material issues on the trial, should not be admitted.

11. SAME—*what not admissible as tending to show condition of mind or motive.* Evidence by a detective, who was placed in jail on a fictitious charge to obtain a confession from the accused with reference to a murder committed some months previous, to the effect that the accused suggested to him that they join in robbing two banks in the city and outlined a plan involving a description of conditions which the witness testified he was familiar with and were as described, is not admissible for the alleged purpose of showing the condition of mind of the accused or any motive for committing the murder with which he is charged.

12. SAME—*what is required where evidence of a blood-hound trailing human being is admitted.* Where the trailing of a human being from the scene of the crime by a blood-hound has been held admissible in evidence it has been required to be shown that the dog is of pure blood and of a stock characterized by an acute sense and power of discrimination, and that the particular dog is possessed of such qualities and has been trained and tested in the matter of tracking human beings only, and these facts must appear from testimony of someone having personal knowledge of the facts.

13. SAME—*qualifications of dog to follow trail is a preliminary question for the court.* Preliminary to the admission of testimony as to a blood-hound trailing a human being, it is the rule in the States where such testimony is held admissible, that the court, in the absence of the jury, shall hear the testimony as to the qualifications of the dog to follow a trail under such circumstances as exist in the particular case.

14. SAME—*person in control of dogs and testifying about them must be shown to be reliable.* In any case, before evidence of the trailing of a human being by blood-hounds can be admitted it must appear that the person in control of the dogs, and who is testifying as to their qualifications, training and performances, is reliable.

15. SAME—*blood-hounds must have been put on trail at place where accused has been.* In States where testimony of the trailing of the accused by blood-hounds is admitted, it is necessary to show that the dogs were placed upon the trail, whether visible or not, at a point where the circumstances tend to show the accused has been and made the trail.

16. SAME—*what testimony as to breed of blood-hound is not sufficient.* Testimony by the owner of a blood-hound to the effect that he did not raise the dog but bought him with the understanding that he was a Russian blood-hound of pure blood, registered by the American Kennel Club, is not sufficient proof that the dog was of pure blood.

17. SAME—*conclusions of blood-hound are too unreliable to be accepted as evidence.* The conclusions of a blood-hound are too unreliable to be accepted as evidence in civil or criminal cases.

18. SAME—*evidence of trailing a horse by blood-hounds is not admissible.* Evidence of the trailing by blood-hounds of one of the horses it is claimed the accused used in driving from the scene of the crime with a team and buggy is not admissible.

19. SAME—*witness cannot be impeached on a matter he could not have testified to.* Where a witness in a criminal case is asked whether he did not make a statement which, in effect, would be an opinion as to the guilt of the accused, and he denies making the

statement, he cannot be impeached by the testimony of the person to whom the alleged statement was made.

20. SAME—*what is a proper subject for impeachment of a witness.* Testimony by a witness in a murder trial that the relations between the accused and the deceased were amicable is material upon the question of motive, and if he denies repeating to a certain person a conversation with the deceased tending to show that such relations were not amicable he may be impeached by the testimony of such person that the conversation was repeated to him.

21. SAME—*when copy of letter written to deceased is not admissible.* A copy of a letter written by a banker to the father of the accused, which should have reached the father in due course of mail on the last day he was seen alive, and which complained of the action of the accused in overdrawing his account, is not admissible in evidence as tending to show a motive for the accused in murdering his father, where there is no proof that the letter was received by the father or that there was any communication between the father and the accused, who was away from home, after the letter could have been received.

22. SAME—*when evidence of experimental test is admissible.* Where the accused, in accounting for his whereabouts on the night of the alleged murder, testifies that after he had entered his tent, a little past midnight, he saw the lights of the midnight train as it passed, evidence as to a test made by setting up a tent at the same place and trying to see the lights of such train is admissible if the conditions are substantially the same as on the night testified to by the accused, and any slight difference as to such conditions goes to the weight of the testimony and not to its competency.

23. SAME—*what statement by the State's attorney is prejudicial.* A statement by the State's attorney in his argument that the accused had said to a certain person, "I am guilty, but God knows I am not to blame," followed by his statement, upon objection that such matter was not in evidence, that the testimony was admitted as he had it in his notes, is prejudicial, where no such testimony was introduced.

WRIT OF ERROR to the Circuit Court of Adams county; the Hon. GUY WILLIAMS, Judge, presiding.

GOVERT & LANCASTER, for plaintiff in error.

P. J. LUCEY, Attorney General, FRED G. WOLF, State's Attorney, and ARTHUR R. ROY, (JOHN E. WALL, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

At the January term, 1913, of the circuit court the grand jury of Adams county returned four indictments against plaintiff in error, Ray Pfanschmidt, one charging him with the murder of his sister, Blanch Pfanschmidt; another with the murder of his father, Charles A. Pfanschmidt; a third with the murder of his mother, Matilda Pfanschmidt; and a fourth with the murder of Emma Kaempen, a school teacher who boarded at his father's home. On a trial before a jury under the indictment for the murder of his sister, a verdict of guilty was returned and his punishment fixed at death. After motions for new trial and in arrest of judgment had been overruled he was sentenced to be hanged on October 18, 1913. The record has been brought to this court for review.

In September, 1912, Charles A. Pfanschmidt, the father, was a farmer living about ten miles south-east of Quincy, Illinois, and from four to five miles north-west of Payson, on the northerly side of a road running south-easterly from Quincy to Payson. His family consisted of himself, his wife, Matilda, the son, plaintiff in error, who was then twenty years of age, and the daughter, Blanch, fourteen years of age. Emma Kaempen, a young lady from Quincy, had entered the home as a boarder early in September, being a teacher in a country school in the neighborhood. During September, and for some weeks before, Ray, who prior to that time made his home with his parents, had been engaged upon a contract for excavating for a railroad switch and coal sheds upon the property of J. L. Frese, just north of the city of Quincy and about fourteen miles from the Pfanschmidt home. On the Frese premises he had established a camp of two tents in an open field about three hundred feet east of Twelfth street and a short distance north of the main line of the Burlington railroad. One tent was used for sleeping purposes by him and one of his men, the other being used for supplies. The Pfan-

schmidt farmhouse was a frame building two stories high, containing five rooms, and faced south. A narrow north and south hallway was in the center. A room opened into it on each side, both on the first and second floors, and the kitchen opened off the east room on the first floor. A one-room cellar was under the east room but did not extend beneath the hall or west room. The upper chambers were used as bed-rooms, the east room usually occupied by the parents and the west room by the daughter or guests of the family. The nearest neighbors were the Kaufmans, father and sons, about a quarter of a mile distant, on the opposite side of the Quincy and Payson road. Somewhat further away, to the north-west, were the Lehr brothers. Other neighbors lived at still greater distances. On the south side of the Quincy and Payson road, opposite the Pfanschmidt home, another highway led directly south. A lane, forming almost a direct continuation of this latter highway, ran north, passing several feet west of the house and continuing beyond it, there being no gate where it left the main highway and a fence on the west side only until the house was passed. The house stood some three hundred feet north of the highway, with an orchard between it and the road, and the barns, granaries and other outbuildings stood a short distance further to the north.

On Friday evening, September 27, 1912, Charles Pfanschmidt, his wife and daughter and Miss Kaempen were in Payson at a political gathering, going in a two-seated surrey drawn by two horses. At about ten o'clock the two young women were in the store of Harvey Groce, where they bought some candy, and all four left for home some time before eleven o'clock. All of them were apparently in good health and spirits and none of them were afterwards seen alive. The following day none of them were seen about the Pfanschmidt premises, although Henry Kaufman and his sons were working in a neighboring field, from whence they commanded a view of the house and its

approaches and for two or three hours were cutting weeds along the highway just west of the lane. Several persons driving along the road past the house on Saturday were attracted by a strong odor, which some of them said they thought came from burning flesh. In the opinion of all these witnesses the smell came from the Pfanschmidt place. This odor was noticed in the morning and became more pronounced later in the day. About eleven o'clock on Saturday evening one of the Kaufman boys (Gus) returning in a buggy from a call approached the Pfanschmidt premises on the highway leading north to them, and opposite the lane he turned to the north-west on the Quincy and Payson road and thence to his home but saw no one about the Pfanschmidt place. E. M. Miller testified that shortly after half-past eleven o'clock the same night, while driving a team of mules to Quincy, being at that time about eight or nine miles south-east of the Pfanschmidt place, he saw a fire in the direction of that farm. Driving on through Payson and along the Quincy and Payson road he found the residence, when he reached it, practically destroyed by the fire, only one corner post standing, the metal roof having fallen upon the burning debris. Several neighbors were already there, and one, whom he overtook, rode with him to the fire. The earliest arrival was Henry Schrecke, who saw the fire ten minutes after two o'clock from his farm west of the Kaufman farm. Following him came the Lehr brothers and other neighbors. The horses and surrey used by the family Friday night were found in one of the barns, the horses in their usual places, unharnessed, and the surrey in the runway in the barn. No attempt was made to extinguish the fire until the arrival of Henry Geisel, a brother-in-law of Charles A. Pfanschmidt, who had been telephoned to at his home about seven miles to the north-west, near the Quincy and Payson road, and who arrived with his son shortly before five o'clock. They then commenced pouring water upon the hot metal roof and burning debris

262 – 27

covered by it.   When it was sufficiently cooled the roof was removed and below were found four bodies, which were taken out and placed in a canvas and later in the day were taken to an undertaking parlor in Quincy, where a post-mortem examination was held by several physicians. The bodies of the three women were found in the west half of the house, the two younger women being side by side on a mattress.   The fourth body was found in the cellar.  . All of the bodies were badly burned and disfigured. The hands of Blanch Pfanschmidt were burned off and the arms were burned to the elbow.   Her feet were burned off and limbs burned almost to the knees.   One side of the head was completely destroyed.   Her hair, in two braids, was under the body.   The remains of Emma Kaempen, found by her side, showed a fracture of the bone over the left eye and another on top of the head.   There was much blood on the mattress upon which these two bodies were found.   So little remained of the body found in the cellar that the physicians could not determine its sex.   The flesh and bones of the head, arms, shoulders, upper trunk, legs and half of the lower trunk were all gone, but a part of one thigh and one side of the lower trunk being unconsumed. The doctors testified this body had been dismembered before being burned, the flesh cut off with a knife and the thigh bone severed with a saw.   The remains of the two young women were identified by several neighbors, and also by the plaintiff in error, before they were removed to Quincy.  While water was being poured upon the burning debris, two of the neighbors going into the barn yard found horse and buggy tracks which turned from the north-west into the Pfanschmidt lane from the Quincy and Payson road, going north past the house and turning to the east between the granary and chicken house and into the barn-yard, there describing a circle with an inner diameter of about nine feet, then passing out again into the lane and thence to the main highway and to the north-west, appar-

ently making no stop at any point within the premises. A light rain fell early Saturday evening and settled the dust, forming a light crust on the surface of the traveled roadways, but the evidence is to the effect that it made no mud. The buggy tracks in this crust or dust are described by some witnesses as flat and by others as somewhat rounded. Many of the witnesses who examined them that morning testified they were made by steel tires, while others testified they were made by rubber tires. The horses' tracks were of a shod team of small horses, about which the great majority of the witnesses discovered no peculiarities on this Sunday morning. The tracks made by the horse and buggy driven by Gus Kaufman turning north-west in front of the Pfanschmidt residence onto the Quincy and Payson road were made before these tracks going in and coming out of the Pfanschmidt lane.

Plaintiff in error, though a minor, had been working for a number of persons in blasting stumps, ditching and other work, using dynamite and other explosives, and was also carrying on a contract for excavating for J. L. Frese for a switch and coal sheds, as heretofore stated. Between half-past five and six o'clock on Friday afternoon, September 27, he left his camp at Frese's with his team and buggy. This was a small team of sorrels, each with a white streak on its face and each weighing between 900 and 1000 pounds. The buggy was an undercut buggy of standard tread, five feet and two inches wide. His camp was located a short distance north of the Soldier's Home, north of Quincy. He took in his buggy with him one of his employees. They drove through the grounds of the Soldier's Home to the home of this employee in Quincy, where the latter got out, and plaintiff in error then drove to an office which he had in the shop of one Chadwick, in Quincy. There he left his team while he went to a restaurant for supper, and then drove out to the home of Daniel Reeder, some three or four miles south-east of Quincy. He

had been for some time engaged to be married to Esther Reeder, a young lady of about eighteen years, who was living at home with her father, her mother having died. The son, Hugh Reeder, and his wife, and a hired man, Henry Brinkman, were also there at the time. They all agree that the young man stayed there until shortly after ten o'clock, when he stepped out with Miss Reeder upon the porch, parting with her in a few moments. She went immediately to her room and he went to his horses and buggy, and after making a slight repair drove off as the clock struck half-past ten. He states that he drove from the Reeder place to the city, falling asleep several times in his buggy, and after he reached Quincy he stopped at Clutch's lunch stand and had a lunch. Clutch denies his presence there on that night. He further testifies that he drove from that place to his camp at Frese's, where he unhitched and went to bed in the tent; that on entering the tent he spoke to Willis Seehorn, who was sleeping there, but doesn't know whether he answered or not; that shortly after going to bed he heard a Burlington passenger train go by west and saw its lights through the tent. It is shown that this train reached Quincy at 12:58 that night. Seehorn, a few days later, in a statement made in the office of the attorneys of plaintiff in error, stated that plaintiff in error came to the tent shortly after midnight and spoke to him, and that he (Seehorn) heard the passenger train go by shortly thereafter. This statement was written down and a few days later taken to him and in the presence of Henry Geisel, after some changes, he signed it. On the trial Seehorn, while admitting signing the statement and that doubtless his memory was as good at the time he made the statement as it was at the time of the trial, testified to the effect that he waked up at half-past one o'clock that night, sat up in bed, struck a match, looked at his watch and saw it was 1:30 and plaintiff in error not in; that he went to

sleep, and was wakened about an hour later by plaintiff in error speaking to him and asking him if he was asleep.

About a half mile north of the Reeder residence is Melrose Chapel and a town hall, standing at the four corners made by Thirty-sixth street extended south, intersecting the Quincy and Payson road, running here east and west. A mile east of Melrose Chapel the Quincy and Payson road turns south for about a half mile and then runs irregularly in a south-easterly direction until it passes the Pfanschmidt home. Commencing nearly in front of the entrance to the Reeder home, and a half mile south of Melrose Chapel, a road runs east from Thirty-sixth street for a half mile and then diagonally south and east until it runs into the Payson and Quincy road about a quarter of a mile north-west of the Pfanschmidt residence. It is called the Pape Mill road. These two roads between these points average a distance of from one-half to three-quarters of a mile apart and run diagonally in the same general direction. The distance from where the two roads meet at Melrose Chapel to the point where they merge at the Pfanschmidt farm is about five miles. Plaintiff in error testified that after leaving the Reeder home he drove north of Melrose Chapel on Thirty-sixth street and did not turn west at that place on the Quincy and Payson road.

Margaret Spindler, who lived in Quincy, was teaching a country school at this time about five miles south-east of Melrose Chapel. Chester Smith came Friday evening, September 27, in a single rig from Quincy to take her home. He reached her boarding place some time after nine o'clock that evening. At a time which they think to be between 9:30 and 10 o'clock the two started along the Pape Mill road. Smith says he traveled toward the city at the rate of about ten miles an hour. After passing the Reeder place and coming to Melrose Chapel they turned west on the Quincy and Payson road. Up to this point they had met no one on the road. Just after they turned to the west

Miss Spindler testified that a team and buggy coming from the west passed them, driving rapidly, and as they passed, whoever occupied the buggy leaned forward and drew more tightly about him a lap robe. Her only description of the team was that it was small and that the buggy had side curtains on. She did not know which direction the team went after it passed her. While Smith in his testimony is not very certain, he testifies that he thinks a team and buggy passed him at or near the Melrose Chapel corner, turning south on the Pape Mill road. Neither of these witnesses attempted to identify the person or persons in the buggy, the buggy or the team. The theory of the State appears to be that the plaintiff in error, after leaving the Reeder place, drove north to the Melrose Chapel corner and then west on the Quincy and Payson road so as to avoid the suspicion of the Reeder family as to what he intended to do, or else desired to avoid meeting Smith's horse and buggy, which he heard coming from the east on the Pape Mill road after he left Reeder's, and that after he had driven a short distance he turned around and drove back, thus passing at the Melrose Chapel corner the Smith horse and buggy, driving then down the Pape Mill road to his father's, where he committed the murders; that he then drove back, reaching his camp north of the Soldier's Home about fourteen miles away, when Seehorn testified he came into the tent in the neighborhood of three o'clock.

A young man named Archie Pape, living in Quincy, testified that on Saturday morning, September 28, while standing at Twelfth and Broadway, in Quincy, shortly after 2:15 A. M., he saw the team of plaintiff in error going rapidly north on Twelfth street. There was a rubber cloth in front of the buggy, preventing any view of the occupant or occupants. This is about a mile and a half south of plaintiff in error's tents. Pape says that he was in a saloon a large part of the evening until after eleven o'clock and then went to see a lady friend, with whom he stayed un-

til two o'clock, and then started home, when he saw the
team and buggy. He says that he had seen the team on
Wednesday evening before, when plaintiff in error called
at his mother's home in Quincy for Esther Reeder. Miss
Reeder testified that she was at Pape's mother's home the
Monday previous, and that plaintiff in error called for her
with his team on Monday night and not Wednesday night.
There is testimony in the record that some of the streets
plaintiff in error would have to pass over if he took the
direction sworn to by Pape on the night in question were
undergoing repairs, and that the plaintiff in error, to drive
through on those streets, would have had to take away
some barriers placed there by the contractors to keep peo-
ple off. Pape's name was not on the back of the indictment
as one of the State's witnesses. The State's attorney testi-
fied that he did not learn anything about this testimony
until two days before Pape took the witness stand.

On Saturday, September 28, plaintiff in error got up
about his usual time, about seven o'clock, and went out to
where they were excavating for the switch track, stayed
there for a time and then went down to his office to look
after some business. He afterward took his watch to the
Odell jewelry store, in Quincy, for repairs. He met one
of the jewelers there, (Mr. Weaver,) who testifies that the
plaintiff in error entered the store in the same way that
anyone else would bring in his watch to be repaired; that
he said he had broken the watch by getting it caught in a
wire the day before; that while they were talking about its
repair, Weaver, who knew him, said, "What is the trouble
with you? You are not looking as well as usual this morn-
ing," and plaintiff in error replied it was on account of
his work and loss of sleep, or something of that sort. The
contention of the State is that this watch was broken the
night before, while he was committing the murder.

Plaintiff in error testified that on Saturday night, when
he was leaving his grandfather's after supper, he asked his

cousin, Howard Petri, to go and stay with him at his tent
over night.   Mrs. Petri also testified to the same effect.
The reason Howard did not accept the invitation, as he
had done at times before, was because they had visitors
from Kansas and his mother thought it would not be polite
for him to leave home.   Plaintiff in error's story is cor-
roborated by all the witnesses that he remained in or near
Quincy all that day until eleven o'clock, or a little after,
on Saturday evening.   He testifies that about 11:15, after
leaving some young men with whom he had spent the even-
ing, he untied his team and drove north to his camp on
the Frese place, reaching there about midnight.   Seehorn
was not occupying the tent that night, and plaintiff in er-
ror does not claim that he saw anyone while going towards
his home or on arriving at his camp until he was called,
about 4:30 o'clock the next morning, by an uncle and one
of his men, Ben Holeman, when he was told by them about
the burning of the home and that the neighbors were un-
able to locate the family.   At the time of telephoning the
remains had not been discovered.   A man named Jenkins
stated that he saw plaintiff in error's team tied on Seventh
street until about 11 or 11:15 o'clock, when someone whom
he could not recognize, untied it and drove south from
that point.   Walter Dingerson, who lived south-east of
Quincy and south-west of the Pfanschmidt home, was in
Quincy on Saturday evening.   He went to several places
and last to a theater.   He left Eighth and State streets,
in Quincy, with his horse and buggy about eleven o'clock,
coming east to Twenty-fourth street, then south to the
Quincy and Payson road and thence east towards Melrose
Chapel, on that road.   Two or three blocks before reach-
ing the four corners at the chapel he caught up with and
passed a team and buggy going east ahead of him at a
walk.   He testified that he drove along behind the buggy
for two or three minutes, and noticed, in passing, that the
buggy was undercut and drawn by two horses with white

streaks on their heads. The back curtain was up and side curtains on, so that he could not see who was in the buggy. He identified the team and buggy as belonging to plaintiff in error. After passing the buggy he went on to his home, seeing no one else. Clarence Crubaugh on this same night drove in a horse and buggy with a young lady to her home on Cook avenue, about a mile north of the Soldier's Home. He left her home on foot about ten minutes after one o'clock and walked towards town. As he approached the Twelfth street gate of the Soldier's Home he heard a team coming over the gravel road towards the north. He did not recognize the team but saw they were small horses, and he could not tell what kind of a buggy it was, other than that it was a top buggy and looked to him rather high. He could not tell who was in the vehicle. At the rate he was walking he thought that when he saw this team it was between half-past one and two o'clock. The theory of the State is that the plaintiff in error on Saturday night, after leaving, at a quarter past eleven, Seventh and Main streets, drove south until he reached the Quincy and Payson road and then went slowly east, where he was passed by Dingerson; that shortly thereafter he came to Melrose Chapel corners, where he turned south on the Pape Mill road and drove rapidly to his home, set the building on fire, drove back along the Payson and Quincy road to Melrose Chapel and from there north and west through the city, when he was seen by Crubaugh not later than about a quarter of two, near the Soldiers' Home. John Lehr, one of the Lehr brothers who lived just north of the Pfanschmidt home, was in Quincy that Saturday night. He left Twenty-fourth and State streets at midnight with his horse and buggy, drove east to Forty-eighth street and then directly south until he struck the Quincy and Payson road a mile west of Melrose Chapel and followed that road to his home, which he reached shortly after two o'clock, about the time his brothers discovered the fire. He did not meet or pass

anyone, to his knowledge, on the way home on the Quincy
and Payson road. He testified that he had been drink-
ing some. There is no testimony, however, indicating that
he did not know what he was about. About a quarter to
eleven on the same Saturday night Carl Mollenhauer and
May Meyers left the EmpireTheater, in Quincy, took some
sodas at a neighboring stand and walked six blocks west,
to where their horse and buggy was left, and started home-
ward. They entered Thirty-sixth street at Harrison street,
passed south along Thirty-sixth street to Melrose Chapel
corners and then east and south along the Quincy and Pay-
son road to within two miles of the Pfanschmidt home.
From Thirty-sixth street to where they turned off the Pay-
son and Quincy road is about six miles, and it was along
this road on the night in question it is claimed by the State
that plaintiff in error returned from his home to his camp.
Miss Meyers and her escort saw nothing of plaintiff in er-
ror or his team. They thought they saw the fire about two
o'clock. They both testified that they drove slowly while
they were on the Payson and Quincy road,—most of the
distance at a walk.

When plaintiff in error was wakened by Ben Holeman
about 4:30 Sunday morning he told Holeman to hitch up
the team and bring it down to his grandfather's home. He
dressed quickly and got in his uncle's buggy and drove to
his grandfather's, near Twelfth and State streets, where
the uncle left plaintiff in error. The latter there told his
relatives of the burning of the home and the fact that the
family were probably destroyed. His aunt, Mrs. Petri, re-
quested him to wait, as she wanted to drive out with him.
Holeman, on reaching the grandfather's place, tied the team
and left it. He testified that he did not find the horses
sweaty or see any other signs of hard driving when he
hitched them up. The man who tended to the team Satur-
day morning testified the same as to the condition of the
team on that morning. As soon as Mrs. Petri was ready

she and plaintiff in error drove rapidly out of the city, plain-
tiff in error urging his team under the whip by the way of
Melrose Chapel along the Pape Mill road until they came
to the Pfanschmidt home, arriving there between six and
seven o'clock.  He .remained there until noon, when he
drove to the Reeder home and took dinner with the fam-
ily, leaving there in the afternoon with Miss Reeder, go-
ing first to his grandfather's home, where an early supper
was eaten, and then on to his camp, thence through the
Soldier's Home ground to Twelfth street to the house of
one Eakin, where Ben Holeman, plaintiff in error's fore-
man, was boarding.  Holeman was away.  While they were
waiting for him Eakin changed for plaintiff in error a dol-
lar, which he thinks was a paper dollar.  Plaintiff in error
was trying to get some change to give to Holeman, and tes-
tified that he was uncertain whether the dollar was silver
or paper, and Eakin himself was not certain that it was a
paper dollar.  Whatever its character, Eakin put it in a
little bag with other money, and afterward found in that
bag among the other paper dollars one with a spot on it,
which he took to be a blood-spot.  Plaintiff in error went
from there with Miss Reeder to her home and remained
there until Monday morning.  There is nothing in connec-
tion with his actions thereafter, until his arrest a week
later, that has any special bearing on his guilt or innocence.

The State claims, and there is evidence tending to sup-
port this contention, that plaintiff in error showed little or
no feeling Sunday morning when notified of the death of
his parents or while at the fire.  According to the testimony
of several witnesses he seemed entirely unconcerned.  Miss
Reeder came with her father about an hour or so after the
plaintiff in error reached the Pfanschmidt home.  When he
met her he kissed her and then took her with him, introduc-
ing her to several with whom he knew she was not ac-
quainted, and pointed out to her the bodies lying under the
canvas, identifying each body.  During this forenoon he

met a young lady whom he knew and shook hands with her. She said it looked as if the murder had been committed Friday night. He replied he thought not, because the stock seemed to have been attended to Saturday. The evidence tends to show, however, that the stock had not been fed nor the cows milked nor any of the farm chores done during Saturday. Relatives of plaintiff in error testified that he, like his father, was accustomed to keep himself in restraint, not showing emotion, his aunt stating that she found him in a little smoke-house near the ruins Sunday crying, and she told him to hold himself in restraint and bear it as best he could. Shortly after this he asked one of the Lehr boys if he had any whisky, and one of them went home and got a bottle and brought it back and plaintiff in error took a drink from it. The testimony shows that he was not a habitual drinker of intoxicating liquors. Several of his relatives and Miss Reeder testified that after the funeral services were over and they were in the carriage returning home he broke down and cried violently. The aunt, Mrs. Petri, and the cousin, Howard Petri, testified that when he was stopping with them at the grandfather's for several days after the fire and before his arrest they frequently found him crying when he had been alone, Howard Petri saying that as soon as he came near, plaintiff in error would try to straighten up and act as if nothing were the matter.

There were hundreds of people visiting the place that Sunday morning. Shortly after plaintiff in error's arrival it was thought best to cover the buggy and horse-tracks in the dust where they turned around in the yard north of the house. This was done, several assisting, including the plaintiff in error. Later, plaintiff in error was talking with his uncle, Fred Pfanschmidt, about getting blood-hounds. Before this, plaintiff in error had gone to the neighbors and called up on the 'phone the State's attorney, Gilmer, and talked with him. At the time he was talking with his

uncle about the blood-hounds it appears that Gilmer, as well as other public officials, was there at the premises. The uncle, after talking about the blood-hounds, went and talked with the State's attorney as to whether they could be used, and came back and said there was no need of keeping the tracks covered,—that the State's attorney said they could not use blood-hounds to advantage. The uncle testified that he then told him to tell the Lehr boys to take those things off. The plaintiff in error thereupon told one of the Lehr boys and the latter started to take the boxes and boards off the tracks, but he was told by a policeman from Quincy, who was there investigating the case, to leave them on. This is urged as evidence of guilt. The chief of police of Quincy, Peter B. Lott, was at the Pfanschmidt home at that time. He, with others, measured the buggy tracks and examined the foot-prints of the horses and also measured the distance between the wheels of plaintiff in error's buggy, which was standing nearby.

A gasoline can was found by the plaintiff in error that forenoon in the debris of the burned house, near the front door. He says that he told the people that was a strange place for the can. Chief of Police Lott and the policeman testified that he said to them that was a strange can, and he was told to keep it. He put it in his buggy, but no one asked him any further about it, and so he left it in the yard and it was taken possession of weeks later by his uncle Fred. It is claimed by the State that this can was one that plaintiff in error had taken from Frese's place, where he was working. Frese himself testified that he had a can very much like that but did not identify the can in question. The testimony does not indicate clearly that this can was different from the cans that plaintiff in error's father had on the home place.

The buggy and horse-tracks found in the barn lot back of the residence were examined frequently on Sunday, September 29, and the Monday and Tuesday following, by

various people. On Tuesday afternoon several men went out from Quincy and took paraffine impressions of the horse-tracks found by them in this barn lot. We think it is clear that some of these men scraped out the tracks, which were seen very indistinctly at first that day, one of them getting an automobile pump and blowing the particles of dirt out of the track. Many witnesses testified that there was nothing peculiar about any tracks appearing in the dust in the barnyard on Sunday. The three tracks of which paraffine impressions were made had a peculiar mark on them that could have been made by a shoe of one of the horses of plaintiff in error. It is the contention of the plaintiff in error that the evidence tends strongly to show that if these horse-tracks were made in the mud they were undoubtedly made by plaintiff in error's horse a week before, when he drove into the barnyard when visiting his home after a heavy rain, and were not the light impressions made in the dust after the light rain Saturday night. The State contends that the evidence shows that these tracks were made during Saturday night, when the house was burned. There is much testimony as to whether a buggy, if not undercut as was plaintiff in error's, could make the short turn found in the barn lot. Witnesses differed about this, several testifying that they were certain that an ordinary buggy with a piano box and no undercut could make as short a turn as the one shown by the tracks.

On Monday morning, eight days after the fire, near the tents of plaintiff in error, in an old vault under an out-house which was filled almost to a level with the ground, a suit, which appears from the testimony to belong to the plaintiff in error, was found on the top of the debris and fecal matter in the front of the vault. A new out-house was being built and when the old one was torn down this suit was discovered. The vault had been examined a week before, on the Monday following the burning of the house, by George Koch, a former chief of police of Quincy, by

looking through the holes in the seats, and nothing was found. The suit was of khaki, apparently one of four suits owned by plaintiff in error. It was found wrapped in a *Quincy Journal* of the date of September 27, 1912. The evidence shows that the Pfanschmidts took the *Quincy Herald* and not the *Journal,* and that the paper of that date was found in the mail at the Pfanschmidt home after the house was burned. The coat and pants of this suit had, besides stains coming from the fecal matter on which they were lying, certain spots which were afterwards found by an expert to be blood-stains. The blood-stains on the suit were of no great number and if united would make a spot about two inches in diameter, some of them being very small. No blood-spots were on the tie and shirt found with the suit. The testimony of one or two of the employees of plaintiff in error is, that on Saturday morning when he went out to the work he did not wear a khaki suit, as he usually did, but a blue suit. Other employees thought he wore a khaki suit, and that is what plaintiff in error testified. His testimony is to the effect that on the day previous he wore the blue suit in question and took it off that day and left it at his grandfather's, where it remained until after his arrest. The sheriff and Koch visited his tent on Sunday, the day after the fire, and testified that they found two complete khaki suits in his tent, to all appearances never having been worn. They also saw a part of a worn khaki suit lying in the tent at that time. Plaintiff in error says he put a new khaki suit on Saturday; that he wore it Saturday evening to his grandfather's, and while there changed to a brown suit, and that the khaki suit was put away by his cousin, Howard Petri, according to the uncontroverted testimony, and remained in the possession of relatives until the trial. A part of another khaki suit was given on Thursday evening before the fire to Ben Holeman and was kept by him until after plaintiff in error's arrest. On Thursday after the fire plaintiff in error's uncle,

Henry Geisel, went to take charge of his nephew's posses-
sions in the tent and found only one new khaki suit there.
It is the contention of plaintiff in error that someone other
than himself took one of these new khaki suits left by him
in his tent and found there by the sheriff and Koch on
Sunday and after Sunday placed it in this vault, while the
State claims that the suit found in the vault was placed
there by plaintiff in error on his return after committing
the murders Friday night, and that for this reason he put
on the blue suit the next morning when he went out to
the work.

Eakin testified the bill with the spot on it was taken by
his wife to Anch's butcher shop, in Quincy. Neither Eakin
nor his wife observed the number of the bill. The Anchs
knew nothing of a bill with a blood-spot on it and were
unable to state what was done with the bill that Mrs. Eakin
gave them, but stated they did their banking at the Illinois
State Bank. About a month after this crime the sheriff
and a detective called at the bank and inquired about this
dollar bill with a small blood-stain on it. One teller looked
through a package but found nothing, and he then told the
officers to look over the pile, and they testified they found
a dollar bill with a stain upon it about the size of a ten-
cent piece. This was on the 31st of October, 1912. This
dollar bill was taken by the officers, and the experts testified
that the stain on it was made by human blood. Eakin stated
that he thought the bill found at the bank was the one
found among his bills the morning after he changed the
money for plaintiff in error, but he did not identify it as
the one given him by plaintiff in error.

A day or two after the fire, after the ruins had been
visited by hundreds, if not thousands, of people, a little girl
who was there with her father picked up from the ground,
several feet from the cellar wall, some of the inner mechan-
ism of a clock, all of the woodwork of which had been
destroyed. The child took it home and it was taken from

her by the public officials some days later. Pfanschmidt had two eight-day clocks, from either of which this mechanism might have come. The State introduced this on the theory that by the use of fuses, wires, gasoline, matches and other material the premises were fired late Saturday night or early Sunday morning by means of the clock, wires being wound around the hands outside of its face. In support of this theory they offered the testimony of George Vasen, who was an electrical contractor and kept a retail electrical store in Quincy. He testified that plaintiff in error called at his place about ten days before the fire and asked to look at some pocket flash-lights, at the same time asking him if he kept fuse for igniting powder. Vasen answered no, and then Vasen volunteered that a thin German silver or iron wire could be used for that purpose. A few days later plaintiff in error called and purchased a small pocket flash-light of the kind usually sold in retail electrical stores. There is no proof that the plaintiff in error bought any wire of the kind they were talking about, or that any wire of that kind was found in the ruins of his father's home or in connection with the mechanism in question.

About the time this trial began in the circuit court one of the Lehr brothers, in digging in the ruins in the cellar of the Pfanschmidt home, searching, as he said, for a key to the school house, which he thought was carried by Miss Kaempen, found the head of a small hand ax, with the handle burned out. This ax-head was submitted to Dr. Erickson, who found bright-red blood-stains on its surface which dissolved in water and glycerine without difficulty and showed well-developed blood corpuscles. Afterward, some of these blood-spots were analyzed and three on the ax-head were found to be made by human blood. The examination as to the blood on the cutting edge did not disclose what kind it was. Experts in metals who examined this ax-head found it had been subjected to a very

high degree of heat, so intense that the surface of the ax scaled under it. The uncontroverted evidence is that a temperature of 170 will fix the blood to the surface of steel so that it cannot be scraped off, and that such a heat as would scale the surface would entirely burn or destroy any blood upon it. The testimony tends to show that a similar ax was owned by the Pfanschmidts before the fire, being usually kept in the granary.

As tending to indicate the motive of the crime the State introduced testimony as to the business of plaintiff in error and the value of his father's property. Plaintiff in error was indebted to the State Bank of Quincy on three notes, the amount being $950. None of them was due and all of them were secured, the father being surety on two and one of the uncles on the other. He also had an overdraft at the bank of $300. He owed the Cottrill Hardware Company $500 on an open account for supplies purchased from time to time. The amount had varied from more than $800 to less than the amount due at the time he was arrested. There was no evidence indicating that the hardware company was pressing for the payment of this account. He had shortly before this made arrangements with a man named Chadwick to go into partnership with him in selling the Rambler automobile on commission. He had made arrangements for one automobile and about $500 had been paid on it by him, and partial arrangements were made for another. Neither of these machines had been received at the time of his arrest. There is testimony tending to show that he was losing money on the Frese contract and the work was far from complete. It appears, however, that he had excavated 10,000 or 11,000 cubic yards at the time and had been paid only $200 on account, and there was about $900 yet due him for work done. The property of his family, including the small farm they lived on, personal property and life insurance of the father and mother, amounted approximately, all told, to $20,000. Daniel

Reeder, the father of plaintiff in error's affianced bride, testified that plaintiff in error at the time of his engagement told him he was no pauper; that when he was twenty-one years of age he was to have $3000 which was then in his father's name in the bank. There does not appear to have been any basis for plaintiff in error's statement as to this $3000. The weight of the testimony is to the effect that plaintiff in error was on the best of terms with his father and mother and sister; that he and his father were great companions and that the relations between himself and his mother were most affectionate. The mother and sister had been in to see him in Quincy the Wednesday before the fire.

We have stated substantially all the evidence that bears on the guilt or innocence of plaintiff in error except that as to his alleged admissions and as to the trailing of his horse by blood-hounds, which we shall discuss later. We shall have occasion also, in discussing the admissibility of evidence, to refer to some other items of evidence.

On February 3, 1913, plaintiff in error filed a motion, supported by his sworn petition, the affidavits of two of his attorneys, and 120 other affidavits executed by residents of Quincy and of seventeen other townships of Adams county, asking for a change of venue from said county. The motion was set for hearing on February 12, 1913. On that date the State's attorney filed a denial of a portion of the matters set forth in the motion, supported by several special affidavits and 2251 of a general character, in opposition to the change of venue. After a hearing the motion was denied. The sworn petition of the plaintiff in error, among other things, set out that a large number of inhabitants of the county subject to jury service had publicly stated that they believed he was guilty of the charge and ought to be hanged; that some of them had declared they would join in hanging him without trial; that many of the inhabitants of the county were so prejudiced that some had

publicly declared that the attorneys defending plaintiff in error were subject to condemnation and should lose the patronage of the people; that the State's attorney had made a public statement, which appeared in the newspapers, that plaintiff in error should have no change of venue because such change would cost the county $20,000; that the sheriff of said county had publicly stated that plaintiff in error was guilty of the charges against him and "the people have the goods on him," which statement had been widely circulated in the press of the county; that the said sheriff had stated to plaintiff in error that numbers of the inhabitants of said county had asked for the privilege of "springing the trap." The special affidavit of one of the attorneys for plaintiff in error stated that there were published in Quincy three newspapers in English, with a circulation of 15,000 copies daily, which had printed numerous highly-colored statements and narratives about the crime and the plaintiff in error's connection therewith; that said attorney had on a number of occasions since the burning of the Pfanschmidt home been present at that place, and there were present at such times large numbers of the inhabitants of the county who conversed there with those who would be witnesses on the trial of the case; that there were present at least four thousand people at the auction of the personal effects of Charles A. Pfanschmidt, including large numbers of witnesses to be called by the People, who conversed with many others assembled there concerning material issues of the case; that affiant had during the previous ten days interviewed more than one hundred inhabitants of the county concerning their feelings, of whom fully ninety per cent stated that they believed plaintiff in error guilty of the charges, and that substantially all of those with whom he talked believed plaintiff in error guilty; that with few exceptions the persons stated that if chosen as jurymen they could not begin the trial without believing him guilty; that many of them said that the plaintiff in error ought to be

hanged, and many of them stated they did not believe he could have a fair and impartial trial in the county but that they would not sign affidavits to that effect because they desired to do nothing which would in any way help him. Affiant further stated that large numbers of the inhabitants of the county, as soon as he and his partner had been engaged in the trial of the case, had openly condemned them for undertaking such defense. Attached to the affidavit and made a part by reference was a letter from the editor of a newspaper published in Mendon township, in which he stated that the prejudice against plaintiff in error in that township was very strong, and that many people stated that he ought to be hanged without a trial, and even hinted at lynch law; that he did not believe a jury competent to try the case could be secured in the township; that not one of the level-headed men of the place would affirm that they thought plaintiff in error could have a fair trial; that while the writer of the letter thought plaintiff in error guilty, he still believed that the trial should be had at some place out of the county, so that the boy could have a chance for his life, even if it did cost the county $20,000. Another of the attorneys of plaintiff in error said that he had made a special effort to ascertain the sentiment as to plaintiff in error and had interviewed between two hundred and three hundred persons in the county; that of the persons talked with, at least fifty signed affidavits stating that plaintiff in error could not have a fair and impartial trial in their circuit court, and of the remainder not signing about ninety per cent expressed an opinion that plaintiff in error was guilty, but a large number of these had seen the State's attorney's statement as to the expense and for this reason opposed a change of venue. This affidavit also set up the fact that to affiant's personal knowledge large crowds had assembled at various times after the commission of the crime, at the Pfanschmidt home, where the evidence was openly discussed in the hearing of many persons who were

to be witnesses at the trial. A. C. Heckle also made an affidavit that he had interviewed many people in various towns of the county and upwards of ninety per cent so interviewed had settled opinions as to the guilt of plaintiff in error, and he stated that the same was true of their friends and acquaintances; that the great majority of those interviewed stated that the cost of a change of venue from the county was such that no change ought to be allowed; that others stated that they thought plaintiff in error could have as fair trial in that county as in any other county, as the feeling against him was widely spread, beyond as well as within the county. One hundred and nineteen other affidavits filed by the plaintiff in error stated, in general terms, that affiants did not believe plaintiff in error could receive a fair and impartial trial in Adams county because of the prejudice of the inhabitants.

The answer of the State's attorney stated that the newspapers had not published all the evidence on the part of the People against plaintiff in error but that many facts and circumstances were known only to the State's attorney; that he had conversed with many persons concerning the crime and was unable to find any sentiment or feeling against plaintiff in error; that the sentiment largely prevailing was that plaintiff in error could have a fair and impartial trial in the county; that he had not, for the purpose of prejudicing public opinion against plaintiff in error, stated "or caused to be stated or to be widely published in the newspapers of that county that the said defendant should have no change of venue because such change of venue would cost the county $20,000; that said State's attorney has publicly stated previously that irrespective of what the cost might be the defendant ought to have a fair and impartial trial," etc. The answer further stated that he had been informed by the sheriff that that official had not, while the motion for change of venue was pending and for the purpose of prejudicing the plaintiff in error,

stated that plaintiff in error "was guilty of the charge made against him." This was sworn to by the State's attorney and also by the sheriff as being "true to the best of his knowledge and belief." The sheriff also made a separate affidavit, in which he said he had talked with many prominent citizens of the county and that he could learn of no prejudice existing among them that would prevent plaintiff in error from having a fair trial, and "that no more interest appears to be taken in this case than any other case of like character." The sheriff's affidavit also stated that up to the time of his arrest, on October 7, plaintiff in error had gone on the streets of Quincy unmolested and without any demonstration being made against him. A special affidavit from the manager of the telephone company was filed in support of the answer, which stated that the relatives of the plaintiff in error belonged to two of the oldest and most respected families in the county, and that he had never heard anything derogatory to either family but had heard discussed the approaching trial of plaintiff in error, and that he did not believe any feeling existed among the inhabitants that would prevent him from receiving a fair and impartial trial. There were special affidavits also by two street car conductors and by two deputy sheriffs, which stated that they thought that plaintiff in error could have a fair trial. C. C. Pfanschmidt, the grandfather of plaintiff in error, also gave an affidavit in support of the answer of the State's attorney, that in his opinion he did not believe that any feeling existed among the inhabitants of the county prejudicial to plaintiff in error, and that "no more interest appeared to be taken in the case than is usually taken in other cases of like character." Affidavits to the number of 2251 from the inhabitants of many different townships in the county, worded in substance the same as the last affidavit, were presented in support of the answer, each of them containing the statement "that no more in-

terest appears to be taken than in other criminal cases of like character."

In discussing the statute on change of venue in this class of cases, this court, in *Jamison* v. *People,* 145 Ill. 357, stated (p. 372) : "Under the statute in relation to changes of venue on account of the prejudice of the inhabitants of the county, * * * the material issue to be tried upon the petition and affidavits filed by the accused and the traverse and counter-affidavits filed by the prosecution is whether there is, in fact, a prejudice in the minds of the inhabitants of the county sufficient to raise a reasonable apprehension that the accused will not receive a fair and impartial trial in the county." (*Price* v. *People,* 131 Ill. 223; *Hickam* v. *People,* 137 id. 75.) An application for a change of venue on account of prejudice is addressed to the sound legal discretion of the trial judge, subject to review in this court. (*People* v. *Donaldson,* 255 Ill. 19; *Chicago and Alton Railroad Co.* v. *Harrington,* 192 id. 9; *Gitchell* v. *People,* 146 id. 175; *People* v. *Turner,* 260 id. 84.) By judicial discretion is meant sound discretion guided by law. It does not mean an arbitrary discretion. (9 Am. & Eng. Ency. of Law,—2d ed.—473; 14 Cyc. 384.) "Judicial power is never exercised for the purpose of giving effect to the will of the judge,—always for the purpose of giving effect to the will of the legislature; or, in other words, to the will of the law." (*Osborn* v. *United States Bank,* 22 U. S. 738.) Deciding what is just and proper under the circumstances of a case is such judicial discretion. In all cases courts must exercise a discretion, in the sense of being discreet, prudent and exercising cautious judgment. (*Murray* v. *Buell,* 74 Wis. 14; *Abbott* v. *L'Hommedieu,* 10 W. Va. 677.) A judicial discretion, in practice, is "the equitable decision of what is just and proper under the circumstances." (1 Bouvier's Law Dict.— 15th ed.—537; see, also, Black's Law Dict.—2d ed.—375; 3 Words and Phrases, 2095, 2098; *Trustees of Schools* v.

*School Directors,* 88 Ill. 100; 6 Ency. of Pl. & Pr. 819.) Abuse of discretion does not mean only the decision of a case by whim or caprice, arbitrarily or from a bad motive, (*Citizen's Street Railway Co.* v. *Heath,* 62 N. E. Rep. 107,) but it also means that the discretion has not been justly and properly exercised under the circumstances of the case. *Murray* v. *Buell, supra.*

The proper decision of the motion for change of venue cannot be made on the basis of the number of affidavits on each side or by the mere preponderance of the testimony. It was not necessary for plaintiff in error to show beyond a reasonable doubt or by a preponderance of the evidence that he could not receive a fair and impartial trial, but a change of venue should be granted if the showing was such as to raise a reasonable apprehension that he could not receive a fair trial. The statement in the 2251 general affidavits filed in support of the answer of the State's attorney against the change of venue, that the case was exciting no more interest than is usually taken in other criminal cases of like character, must be taken with considerable allowance in view of the record before us. It is shown conclusively here, not only by the affidavits but by the evidence heard at the trial, that the case had aroused most intense interest all over the county. The uncontroverted testimony is that on Sunday after the Pfanschmidt homestead was burned and the bodies had been found hundreds of people visited the scene of the fire, some witnesses testifying that more than two hundred automobiles were there that day and several hundred buggies and wagons. It is apparent, also, that for some time following, numerous visitors were there daily, and the curiosity or interest was such, as shown in the affidavits for this change of venue, that four thousand people, or more, were in attendance there at the sale of the personal effects of Charles A. Pfanschmidt. Rarely in any county, or in any State, has there been committed so atrocious and revolting a crime,—the destruction of four

human lives, the dismemberment and almost complete destruction of one of the dead bodies, and the burning of the house. Is it reasonable to say that such a crime, with all its attendant circumstances, would not arouse more than the ordinary interest of any trial for homicide?

The answer of the State's attorney does not deny, in terms, certain portions of the affidavits in support of the motion. It does not deny that many of the people in the county were opposed to the change of venue on account of the cost. His answer is only to the effect that he did not make such a statement publicly for the purpose of prejudicing public opinion against plaintiff in error or cause the same to be widely published. None of the affidavits deny the statement made in support of the motion that many of the inhabitants of the county had openly condemned the attorneys of plaintiff in error for undertaking his defense. While the affidavit of the sheriff says that he did not, while this motion was pending, for the purpose of prejudicing the plaintiff in error, state that he was guilty of the charge against him, the affidavit plainly admits that he did make such statements and merely denies that he did so for the purpose of prejudice. Neither does he deny that the statement of plaintiff in error is true that he, the sheriff, has stated to plaintiff in error that numbers of the inhabitants of the county had asked for the privilege of "springing the trap" at his execution. These specific statements that were made in the affidavits in support of the motion cannot be fairly held to be denied by the statement found in the answer of the State's attorney and the affidavits in support thereof, that they did not think the inhabitants of the county were so prejudiced against plaintiff in error that he could not have a fair trial in the county. If these statements were true, (and on this record they must be taken to be true,) surely such a situation would furnish a basis for a reasonable apprehension that the accused could not receive a fair and impartial trial in the county. We would

be reluctant to believe that in an ordinary case of a trial for homicide such feeling or prejudice as shown here would be aroused in the county where this trial took place or in any other county in the State. We have had our attention called to no case, and have found none, where a like situation showing the prejudice of the inhabitants has been presented. Under the circumstances of this case we are constrained to hold that the proper construction of this statute required that the motion for the change of venue from Adams county on account of the prejudice of the inhabitants should have been allowed to some county where such prejudice did not exist.

Plaintiff in error was committed to the county jail of Adams ·county October 9, 1912, and was thereafter confined without bail until the trial. January 31, 1913, an indictment was returned against him, at the January term, charging him with the murder of his sister, Blanch. The cause was set for trial March 18, 1913, and the trial began on that date. After the motion for change of venue from the county was overruled the cause was set for hearing before another judge of the circuit, and on March 22 an order was entered that all motions pending and undetermined at the January term be continued and the court adjourned until term in course, except in this case, which was then on trial. Six jurors had been selected, but no jury had been sworn to try the cause when the court convened in this cause on Monday morning following. A motion was then made that plaintiff in error be discharged and set at liberty. This motion was overruled. The statute requiring any person committed for "a criminal offense and not admitted to bail to be tried at some term of court having jurisdiction of the offense commencing within four months from the date of the commitment," should receive a reasonable construction. This trial, on the showing of plaintiff in error, was begun at a term commencing within four months of the time he was committed. There is no

force in the contention of counsel that the statute requires, under such a situation as presented here at the adjournment of the January term of the Adams county circuit court, that a criminal cause on trial should be continued, under the statute, until the next term of court. Such a construction of the statute would defeat its purpose. Under the construction heretofore given this statute, the motion to discharge the defendant and set him at liberty was properly overruled. *Healy* v. *People,* 177 Ill. 306; *People* v. *Murphy,* 212 id. 584; *People* v. *Miller,* 256 id. 88.

Counsel for the plaintiff in error further insist that the court improperly admitted many statements of officers and detectives alleged to have been made in the presence and hearing of plaintiff in error while in the custody of the sheriff. Joseph H. Lipps, the sheriff, who had plaintiff in error in custody from the time of his arrest, October 7, 1912, until his trial, testified that plaintiff in error was taken out of his cell frequently and interviewed by detectives in his presence; that sometimes the interviews lasted four or five hours at a time; that one night they kept the plaintiff in error up, talking to him, from 9:00 P. M. until 2:00 o'clock the next morning; that until weeks after his arrest he was not permitted to see and talk alone with any of his friends or relatives except his attorneys. Detective Young was permitted to testify that on the day of plaintiff in error's arrest, after he was brought to the jail, the sheriff said to him, "Ray, you are under arrest on the charge of murder and you have the right to stand on your constitutional privilege, and anything you say may be used against you;" that thereupon he and the others began to talk to and question the plaintiff in error; that while they were talking, his attorney, Mr. Govert, came in, and walking up to the group said, addressing the plaintiff in error, "You are under arrest charged with a serious crime and as your attorney I tell you not to talk;" that the sheriff then spoke up and said if he was innocent he would want

to talk, and the witness himself followed with the remark, "that may be the reason that Govert doesn't want his client to talk,—because he might say something that would be used against him." The witness testified that a week or ten days later he had another talk, and on various days thereafter still other talks, with plaintiff in error. At one of these talks he testified that he said to plaintiff in error: "My boy, you will never feel right until you clear your mind of this load you are carrying. I want you to listen to what I am saying to you. I don't want you to answer any question I might put to you and I am not trying to trick you or trap you in any way. I am merely outlining your position as I see it. * * * I want you to understand, if after I am through talking with you you have any fault to find with any argument I advance, I want you to tell me, but I don't want you to tell me anything about the case in any way. * * * I then told him he was a young man, and I told him it was putting the people and everybody to a lot of expense and he was spending a lot of his own money, and the people would not be satisfied, and he would not be satisfied, and nobody would be satisfied, until all the facts had been brought out, and if he would throw himself on the mercy of the court and ask for clemency and say he was sincerely sorry, that, in my judgment, would be the best thing for him to do. * * * I told him then, along this point, that you know you passed several people on the road Friday and Saturday nights. * * * There have been many things discovered that you have no knowledge of and that you will not know unless the case comes to trial." Witness said that plaintiff in error said nothing in reply; that the witness then said: "I want you to tell me if you have any fault to find with my argument; I am trying to advise you honestly." That the plaintiff in error said he had nothing to say. Deputy sheriff Schaefer then took part in the conversation, and to most, if not all, of his questions plaintiff in error did not

reply. The conversations are too long to be set out in detail, but nothing was said by plaintiff in error in any of these conversations, as so testified to, that in the slightest degree tended to admit his guilt of the crime charged against him. On the contrary, he repeatedly said, as testified to by the various witnesses, that he "would talk when the proper time came," or that "he refused to answer under the advice of his attorneys," or that "he had nothing to say," or "he did not want to talk about that." A few days after this interview Young again had a long interview, in the presence of the sheriff and deputy sheriff, with plaintiff in error, in which he repeated, in substance, the arguments that he had made on the former occasion, to which we have just referred. Finally, after talking with him for some time, one of them asked if he would not believe what his uncle, Fred Pfanschmidt, would say, and plaintiff in error replied, "Yes." Young then asked him if he would believe that his uncle would advise him to do what was right, and his reply was, "Yes, it would be all right to get his uncle Fred down and he would like to talk it over with him." The witness replied that he would try to get his uncle down the next day, and that plaintiff in error said there was no hurry about it. Young testified he could not get Fred Pfanschmidt that day, and plaintiff in error was then asked if he would like to talk to his uncle William Abel, and he replied that he would. The sheriff testified, with reference to this same interview, that he had never permitted plaintiff in error before that time to have any private interview with any of his relatives or friends except his attorneys, although plaintiff in error had often asked to have a private talk with some of them. The uncle William Abel was brought to the jail and in the presence of plaintiff in error Young made a long statement, in which he repeated, in substance, all that he had said to plaintiff in error in his previous talks with him. The uncle and plaintiff in error were then left alone, and the uncle testified

plaintiff in error said, "I want to see Esther and I want to see my uncle and my attorney, and if you will come back to-morrow night I will tell you all about it." The Esther in this statement was Esther Reeder and his uncle was Fred Pfanschmidt. This statement of his was repeated, in his presence, by his uncle to the detective and the sheriff, and he was permitted the next day to see, alone, Esther Reeder, her father and his uncles. The next night his uncle William came back and plaintiff in error talked with him, and what he said to his uncle the court would not admit in evidence. He was permitted, however, to answer the question asked by the court, "Did he upon that Monday night confess that he perpetrated the crime with which he was charged?" and his answer was, "No, sir." Daniel Reeder, the father of Esther Reeder, visited plaintiff in error previous to his last talk with his uncle William, and a part, if not all, of his talk with him was in the presence of the sheriff. Mr. Reeder was asked this question, among others: "I will ask you whether or not on that occasion Ray Pfanschmidt did not say this, or this in substance: that the officers wanted him to plead guilty and that he was not guilty?" On objection of the People the court refused to allow the witness to answer this question. The witness testified that at this conversation deputy sheriff Schaefer asked the witness if he would not advise plaintiff in error, and that Schaefer said that "Ray would probably get sentenced if he confessed and get off with a few years,—say ten or twelve years."

The sheriff and deputy sheriff were permitted to testify to another interview in January, 1913, in the jail, at which one of the prisoners named Viehmeyer, who was confined for wife abandonment and had served time in the penitentiary, was present. Viehmeyer was not called as a witness. In part this testimony was to the following effect: Schaefer asked the plaintiff in error if he had not told Viehmeyer that the finger-print business did not bother him at

all,—that he wore gloves on both days,—and that the plaintiff in error either made no reply or said, "I will talk when the time comes." Schaefer then asked Viehmeyer, "Did he say that to you?" and Viehmeyer said, "That is what he said." The witness said the plaintiff in error did not reply to this statement, or said, "I will talk when the time comes." The following question was then asked, "What, if anything, was said upon that conversation about meeting anybody out there on Friday night, immediately before the fire?" The witness stated that Viehmeyer then said "that he said he had met Dingerson, but he did not know him or Dingerson would probably have heard him." The witness further said that plaintiff in error did not reply to this but said he would talk when the time came; that he then said to plaintiff in error, "Didn't you tell Viehmeyer that it was the custom of your folks to have lunch after they had been out, and that someone had to help unhitch the horses, and didn't you tell Viehmeyer that you helped him with it?" Schaefer then asked Viehmeyer, "Did he say that?" and Viehmeyer replied, "That's what he told me." Counsel for plaintiff in error, when these questions were asked, objected, and the objection was overruled and exception taken, and after they were answered a motion to strike them out was made and exceptions preserved. They also made the same objection and exception to the other interviews to which we have heretofore referred. We shall not attempt to set out in any more detail the evidence admitted as to these various conversations. What has already been stated shows sufficiently their character.

An admission or confession may be implied from the conduct of the party when charged with a crime or with complicity therein, or when statements are made in his presence affecting him, when the circumstances afford him an opportunity to act or speak in reply and men similarly situated would naturally deny the implied guilt or make explanations or statements. (1 Greenleaf on Evidence,—

16th ed.—sec. 197; *Ackerson* v. *People,* 124 Ill. 563.) Such evidence is admitted, not because somebody else made the statement, but because the accused has expressly or impliedly ratified and adopted it as his own. (2 Wharton on Crim. Evidence,—10th ed.—sec. 679; *Merriweather* v. *Commonwealth,* 4 Am. & Eng. Ann. Cas. 1039, and note.) When it appears that the accused did not adopt the statement as his own, from whatever cause, it ought not to be admitted. Moreover, such evidence should be received with caution. (1 Greenleaf on Evidence,—16th ed.—sec. 200.) If the accused is restrained from making a reply "by fear, by doubts of his rights, by a belief that his security will best be promoted by his silence, then no inference of assent can be drawn from that silence." (*Commonwealth* v. *Kenney,* 53 Mass. 235.) If the accused says he refuses to answer because he is acting under the advice of counsel, or for any other valid reason, the evidence should not be admitted. (Jones on Evidence,—2d ed.—sec. 289; *People* v. *Conrow,* 93 N. E. Rep. 943; *O'Hearn* v. *State,* 25 L. R. A. (N. S.) 542, note; *People* v. *Kessler,* 44 Pac. Rep. 97. See, also *Slattery* v. *People,* 76 Ill. 217.) In discussing the principles underlying this rule, the late Mr. Justice Brown, of the United States Supreme Court, said .in *Brown* v. *Walker,* 161 U. S. 591: "If an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier State trials, * * * made the system so odious as to give rise to a demand for its total abolition. * * * So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists, that the States with one accord made a denial of the right to question an accused person a part of their fun-

damental law, so that a maxim which in England was a mere rule of evidence became clothed in this country with the impregnability of a constitutional enactment." (*Bran* v. *United States,* 168 U. S. 532.) There is no basis in this record to support an argument that plaintiff in error in any manner acquiesced in the truth of the statements or assertions made in his presence in these various interviews. Would any reasonable man in like circumstances, when he had been advised by his attorney time and again not to talk, be expected to reply to accusations of the kind made in these interviews? Manifestly not.

Counsel for the State contend that when plaintiff in error said that after talking with his lawyers, Esther Reeder and his uncles he would tell all about it, he necessarily meant he was guilty and that he would tell all about how the crime was committed. Conceding, for the sake of the argument, that their construction of this statement is correct and that was what he meant by it, necessarily, then, under all the authorities, what he said to his uncle should have been admitted in evidence as a part of the same conversation. The fact that it took place out of the hearing of some of the parties to the first part of the conversation would make no difference as to the rule of law that if a part of a conversation is admitted all must be. (1 Greenleaf on Evidence,—16th ed.—secs. 216, 218; 2 Wharton on Crim. Evidence,—10th ed.—sec. 688.) We think, however, all of the conversation as to being willing to talk to his uncle was inadmissible, because it appears from the uncle's statement that he did not confess the crime, but, on the contrary, entered a denial. Statements incriminating the accused, made in his presence but denied by him, are not admissible against him. (Underhill on Crim. Evidence,— 2d ed.—sec. 122; *Commonwealth* v. *Treffethen,* 157 Mass. 180; *Ware* v. *State,* 96 Ga. 349; *Merriweather* v. *Commonwealth, supra,* and note; *O'Hearn* v. *State, supra,* and note.) Furthermore, there is force in the contention of

counsel for plaintiff in error that what was meant in his statement that he would tell all about it, was only that he would tell where he was and all about what he had done on Friday night and Saturday night. The bill of rights provides that "no person shall be compelled in any criminal case to give evidence against himself." Our Criminal Code has provided, for three-quarters of a century, that the failure of the accused to testify shall not create any presumption against him nor shall the court permit any comments to be made upon such silence. Of what avail are these provisions if such statements are admitted as those testified to by the sheriff, deputy sheriff and detective Young? If the rules of law required him to talk, regardless of the advice of his attorneys, or answer questions or statements of the nature here put to him, or else it would be understood he was acquiescing, by his silence, in their truth, then the provision of our bill of rights that in all criminal prosecutions the accused shall be entitled to counsel is but an empty form. These provisions of the constitution and the Criminal Code require no construction. Their meaning is clear. Until changed by the people through constitutional or legislative amendment they must be enforced in the courts. The admission of these statements must be held reversible error.

Complaint is also made of certain other evidence admitted and afterwards stricken out. The sheriff testified that after the coroner's jury had returned their verdict against plaintiff in error he asked him if he had heard what the coroner's jury did, "and he says, 'Yes.' 'Well,' I says, 'you see they held you without bond and we haven't given all our evidence; that we have enough under cover to give you the rope." Detective Young testified that at one of his interviews he said to plaintiff in error, "You are in a pretty bad fix, my boy." The grandfather, C. C. Pfanschmidt, was called as a witness by the People. After testifying to some immaterial matters he was permitted to state: "Ray was at my house a week before this Saturday

night. It was on Sunday night. He drove in with his team." He was asked, "Did anybody help him put up his team?" and answered, "No, sir; he put the team up himself and then came to the house and went off some time just after dinner, and I fed and watered the horses after dinner and then fed and watered them later in the afternoon. I looked at him pretty straight." After testifying that he found in the barn that day, under the lap-robe, a revolver belt full of cartridges all around, he was asked, "What did you say to him when you made this discovery?" He answered: "I didn't say anything to him that time at all. I could not say what time he came to get that team, but I looked at him strong in his eye." The witness continued: "Monday he came back—Monday evening, after dusk. I was sitting in my room talking to the boy, and I said, 'I understand you are going into the automobile business too,' and he said, 'Yes, there is a lot of money in that,' and I said, 'Yes, with you it is always money, money, money.'

Q. "What, if anything, was said on that occasion by you at any time?

A. "Just what I told Ray there myself that evening; says I, 'Ray,' just this way, 'You are going to the dogs, and you are going damned fast;' that is the way I put it.

Q. "What, if anything, did you say upon that occasion as to what he was going to do along the line the McNamaras were doing?

A. "I said, 'You are going exactly where them dynamiters out in California are.'

Q. "What did he reply?

A. "He gave some answer, but I don't know what he said."

All of this testimony was objected to when it was offered and exception was taken, and afterward a motion was made to strike it out. As to some of it the motion was made after the answer was given; as to other parts it

was made after the entire testimony was in.  This evidence
was erroneously admitted under the rules of law heretofore
discussed as to statements made to the accused.  It would
be difficult to imagine any evidence that could be more
prejudicial to plaintiff in error than such accusations made
from the witness stand by his own grandfather.  Even
though that evidence was stricken out by the court, it is
doubtful if that could remove from the minds of the jury
the impression made or remedy the harm done.  (*Foster* v.
*Shepherd,* 258 Ill. 164.)  Evidence admitted and afterward
stricken out, no more harmful than this, was held preju-
dicial by the New York court of appeals in *People* v.
*Conrow, supra.*

A detective by the name of Richard Farley was placed
in the jail at Quincy on a fictitious charge, in order, if
possible, to obtain a confession or admission from plaintiff
in error.  He was permitted to testify to matters entirely
foreign to this case, tending to prove that plaintiff in error
was interested in the commission of other offenses in no
way connected with the one now before the court.  Farley
testified that the plaintiff in error had told him there were
two banks in Payson which had no vaults but simply safes
which contained $10,000, and that the fuse-box of the tele-
phone company was situated on the outside of the building;
that a person could easily pull the plug of the fuse-box and
thereby stop all communication and make it easy to escape,
and suggested that they join in robbing the bank.  To sup-
port this testimony another witness was permitted to state
that he was acquainted with the telephone connections at
Payson and that the fuse-box could easily be reached and
the plug pulled from the outside of the building, as stated
in the testimony of Farley.  We do not agree with the con-
tention of counsel for the People that the objection to this
evidence was not properly made.  They further insist, how-
ever, that if it was properly made the evidence was admis-
sible upon the question of motive, or, as they suggest, to

show the condition of mind of plaintiff in error. How his condition of mind long after the commission of the crime for which he was held would have any bearing on his guilt or innocence is difficult to conceive. Neither did that evidence have any bearing upon the question of motive. The motive attributed to the accused in any case must have some legal or logical relation to the act, and evidence of other transactions involving suspicion of wrongdoing or of acts from which inferences of moral turpitude may be drawn, which have no bearing on the main fact to be proved or to the material issues on the trial, should not be admitted. (*People v. Fitzgerald,* 156 N. Y. 253.) It was error to admit this evidence. *Jansen* v. *People,* 159 Ill. 440; *People* v. *Gibson,* 255 id. 302; *People* v. *Jennings,* 252 id. 534.

The court permitted, over objection, witnesses to testify to the trailing of one of the horses of the plaintiff in error by two dogs owned by H. O. Strumpher, which were brought by him to the Pfanschmidt farm on Monday morning following the fire. Between eight and nine o'clock they were taken into the barnyard and given the scent of the horse from one of the horse-tracks in the dirt that had been covered up by the boxes and boards the day previous. This, by all the evidence, was more than thirty hours after the track was made. Each dog had a harness or collar around his neck and shoulders, to which was attached a twenty-foot leash, and the man in charge thereby kept control of the dog. The actions of only one of the dogs need be referred to specifically as the other dog was not used to trail the entire distance, and if testimony of the actions of the dog that Strumpher controlled and which he called "Nick Carter" was not admissible, that concerning the actions of the other dog, "Roger Williams," was certainly not admissible. Strumpher testified that when he put Nick's nose in the horseshoe-track he bayed, and that was an indication that he had taken the scent. Some of the wit-

nesses standing by said it looked to them as if the dog may have bayed because Strumpher was ·poking his head down roughly. However that may be, the dog, with Strumpher holding the leash, went out the lane and turned to the north-west on the Payson and Quincy road, and after passing by the entrance of the Pape Mill road about a quarter of a mile from the Pfanschmidt residence was taken into an automobile, and carried, with Strumpher, to within one hundred feet or so from the next cross-road, where Strumpher took him out, and the dog, according to Strumpher's testimony, picked up the scent again, and after following it for a short distance past the cross-road he was again taken into the automobile, with Strumpher, and taken to the next cross-road, and this operation was repeated at all cross-roads they passed in following the Payson and Quincy road from the Pfanschmidt residence to the city of Quincy. After following the streets for some distance in the city the crowd became so great that the dogs were put in an automobile and they went away for a time and then came back, and Strumpher got out of the automobile with the dog and followed him north along various city streets until they came to a pasture some distance south-east of the plaintiff in error's camp. The dog, after a gate was opened, went into this pasture and across a creek to a wire fence, and apparently, according to the testimony, wanted to go through or over the fence towards plaintiff in error's camp, which we judge was a half mile or more away. At this point the witnesses say they saw a buggy track, which the hound followed around and back again to the traveled road, and finally reached the road that the plaintiff in error usually drove on in going to his camp and went to the buggy standing on the ground between the tent and stable, nosed around, went then first to the tent of the plaintiff in error and then back to the buggy and smelled about it. Strumpher accounted for his actions here on the ground that the dog got the scent of the horse and man mixed.

Strumpher then repeated to him several times, as he had frequently done before, the command, "Pick it up; pick it up." Thereupon the dog went to the stable and nosed around one horse, and then, according to Strumpher's testimony, lay down behind the horse which wore the shoe that it is alleged made the track in the Pfanschmidt barn lot, and Strumpher testified that he took this to be a sign that this horse was the one the scent of which the dog had been following. Other witnesses testified that they did not see that the hound attempted to signify that one horse more than another was the one he was picking out as having followed. The route that the hound followed into this pasture caused him to travel about three miles more than if he had gone directly as plaintiff in error was wont to drive. There is no other evidence that plaintiff in error ever drove his team into this pasture.

Strumpher testified that the blood-hounds have a natural instinct for nothing except human scent but must be trained to follow the scent of a horse or other animal; that the scent of a blood-hound to trail animals must be developed. The standard authorities state that the true hound, such as the blood-hound, fox-hound and stag-hound, hunt only by scent, while the grey-hound and deer-hound hunt by sight, alone. (9 New Int. Ency. 601; 8 Ency. Britannica,—11th ed.—378.) Strumpher testified, in accordance with the accepted theory as to the ability of a blood-hound to track by scent, that every individual or animal has an odor peculiar to himself or itself, which will be especially noticeable on the spot where the animal or man has touched the ground in walking; that particles of waste matter given off by the particular individual or animal, "from sweat glands or other ducts," remain on the ground, and while undergoing some chemical change, if they come in contact with the olfactory nerves of the hound create an impression which he is able to recognize and distinguish from all other impressions. Necessarily, after a lapse of a

considerable time, or on a public street or highway where many people have traveled since the individual or animal has passed, the trailing must obviously be difficult, if not oftentimes impossible. The authorities are not in accord as to whether such evidence can be admitted. The majority of them, however, hold that when the proper foundation has been laid, the result of the trailing of a human being by a blood-hound from the place of the crime may be shown in evidence.. The first reported case seems to be that of *Hodge* v. *State,* 98 Ala. 10. The authorities hold that it must be shown that the dog is of pure blood and of a stock characterized by an acute sense and power of discrimination, and that the dog in question is possessed of these qualities and has been trained or tested in their exercise in tracking human beings only, these facts appearing from the testimony of some person who has a personal knowledge on those points. (*Pedigo* v. *Commonwealth,* 103 Ky. 41; *State* v. *Freeman,* 146 N. C. 615.) Preliminary to the admission of such testimony the rule is that the court, in the absence of the jury, should hear testimony as to qualifications of the dog to follow a trail under such circumstances as exist in the given case. (*State* v. *Rasco,* 239 Mo. 535; *State* v. *Adams,* 85 Kan. 435.) It is also held that before such testimony is competent it ought to appear that the person in control of the dog, and who is testifying about him, is reliable. (*State* v. *Adams, supra.*) The competency of such evidence has been passed upon in comparatively few of the courts of last resort in the United States, but in the majority of the jurisdictions where the question has been raised it has been held that when the foundation has been laid to the satisfaction of the court such evidence may be admitted to the jury for what it is worth, though it must always be shown by other evidence that the dog is placed upon the trail, whether visible or not, concerning which the other evidence in the record relates, at a point where the circumstances tend clearly to show the

guilty person has been and has made the trail. (*Parker*
v. *State,* 3 Am. & Eng. Ann. Cas. 893, and note; *State* v.
*Dickerson,* 77 Ohio St. 34; *Spears* v. *State,* 92 Miss. 613;
*Gallant* v. *State,* 167 Ala. 60; Underhill on Crim. Evi-
dence,—2d ed.—sec. 374*a;* 1 Wigmore on Evidence, 177.)
A conviction has never been sustained on such evidence
alone. In *Brott* v. *State,* 97 N. W. Rep. 593, the court
held that such evidence was inadmissible, saying, after dis-
cussing the question at some length, that "the blood-hound
is, we admit, frequently right in his conclusions, but that
he is frequently wrong is a fact well attested by experience.
* * * It is unsafe evidence, and both reason and instinct
condemn it." (See, also, *McClurg* v. *Brenton,* 123 Iowa,
368; *Stout* v. *State,* 25 Am. & Eng. Ann. Cas. 37, and
note.) In *Pedigo* v. *Commonwealth, supra,* the court, not-
withstanding it held such evidence under proper prelimi-
nary proof admissible, stated (p. 50): "It is well known
that the exercise of a mysterious power not possessed by
human beings begets in the minds of many people a super-
stitious awe, like that inspired by the bleeding of a corpse
at the touch of the supposed murderer, and that they see
in such an exhibition a direct interposition of Divine Provi-
dence in aid of human justice. The very name by which
the animal is called has a direct tendency to enhance the
impressiveness of the performance, and it would be danger-
ous in the extreme to permit the introduction of such tes-
timony in a criminal case under conditions which did not
fully justify its consideration as a circumstance tending to
connect the accused with the crime."

There was no testimony here as to the character, re-
liability and integrity of the owner of the dog except his
own testimony, and that tends to weaken the weight to be
given to his memory, at least, for on his direct examina-
tion he testified, in effect, that he walked or ran after the
dog nearly all the distance from the Pfanschmidt place to
Twenty-fourth street, in Quincy, when the testimony of the

witnesses for the State all agrees that he rode in an auto-
mobile at least half the distance, getting out only at the
cross-roads. Furthermore, it is not shown clearly whether
he took Nick out at every lane or entrance to a farm house,
and the evidence shows that there were several places along
the road where there were no fences on either side and that
horses could have been driven out of the road across the
fields. The only testimony as to the breed of this dog
was that of the witness Strumpher, who said that he did
not raise him, but bought him with the understanding that
he was a Russian blood-hound of pure blood, registered
as such with the American Kennel Club. Affidavits offered
on motion for a new trial were to the effect that the dog
was not registered by that club. The dog was, according
to the witness' testimony, educated to trail both men and
animals. The testimony on this point with reference to
the dog's experience was taken by the court in the pres-
ence of the jury. Strumpher stated, in answer to questions,
that the dog had trailed successfully many times. This
statement the court allowed to stand, striking out, however,
testimony as to the convictions that Strumpher testified to
as a result of such trailing. The admission of this testi-
mony resulted in the defense attempting to show, on cross-
examination and on rebuttal, by other witnesses, that the
dog had failed when attempting to follow a much fresher
trail than that in the present case. The trail the dog was
supposed to follow in this case was more than thirty hours
old, and had all day Sunday been disturbed by hundreds of
autos and buggies coming and going along the Quincy and
Payson road to the Pfanschmidt place. No part of this
trail, except the tracks in the barnyard, was protected from
the people, horses or vehicles that visited the scene Sunday
and early Monday morning, so that probably not a vestige
of the trail of that team was left undisturbed in the dust of
the highway when the dog was put upon it. The first part
of this alleged trail from the Pfanschmidt residence along

the Quincy and Payson road to the entrance to the Pape
Mill road, something over a quarter of a mile, had been
traveled by Ray Pfanschmidt's team about a week prior to
the burning of the Pfanschmidt home, and on the Sunday
after the fire Ray Pfanschmidt drove his team and buggy
along the Pape Mill road from Quincy to his home and
returned that day along the same road, passing twice that
day, with the same team, over this portion of the Payson
and Quincy road along which the alleged trail was followed.
Why did not the dog, if he was following a scent, follow
the fresher one made by this horse of Pfanschmidt Sunday
and trail him along the Pape Mill road instead of along the
Payson and Quincy road? It is hard to believe that the
dog could not only distinguish the scent of a particular
horse from all others, but could also distinguish the trail
of that horse made at a particular time from the trail of
the same horse made less than a day later. Then, too, in
trailing the horse when it reached plaintiff in error's camp
north of Quincy, why did the dog go first from the buggy
to the tent instead of following the horse to the stable?
There is no evidence in this record, other than that as to
the trailing by the blood-hound, indicating that Ray Pfan-
schmidt, or anyone else, drove in a buggy from the Pfan-
schmidt residence along the Quincy and Payson road to
Melrose Chapel on the Sunday morning after the fire was
started. Indeed, the evidence given by one of the Lehr
boys and Mollenhauer and Miss Meyers would tend strongly
to indicate that no team passed along that road at that time
going toward Quincy. No reason is suggested by the evi-
dence why plaintiff in error should have driven his team
the night of the fire three miles out of his way, over an
almost impossible route, opening a gate into the pasture
north-east of Quincy and then back again to the highway.
From the testimony of the witness Strumpher, without
doubt there were many times, in making this trail, that
the dog hesitated and was undecided which way to go, and

yet the result of that decision in each case was admitted without the opportunity to inquire as to the real reason for the decision, as must necessarily be the case in the admission of such testimony.

No court has admitted this class of testimony without certain preliminary proof as to the qualifications of the blood-hound and the conditions under which the trail was followed. Even in States where such evidence is held competent, the highest courts have reversed cases because the evidence in the given case either did not show that the dog was properly trained, or the conditions under which the trail was followed were such as to convince the court that its admission would be improper. (*Davis* v. *State*, 46 Fla. 137; *State* v. *Norman*, 153 N. C. 591; *State* v. *Moore*, 55 L. R. A. (N. C.) 96; *Pedigo* v. *Commonwealth, supra.*) In all these cases the testimony as to the training of the dog and his experience and qualifications was as satisfactory as in this case. In none of them were the difficulties and obstacles as to the dog following the trail as many or as great as here. This being so, under consistent rulings in those jurisdictions, would not the trailing of a man by blood-hounds under the circumstances shown in this record be held inadmissible? The reason against its admissibility in trailing an animal must be stronger. Evidence of the trailing of an animal by a blood-hound, so far as we are advised, has never been admitted by any court or sanctioned by any standard legal authority in this or any other country. Furthermore, we have reached the conclusion that testimony as to the trailing of either a man or an animal by a blood-hound should never be admitted in evidence in any case. A blood-hound may be used to track down a known fugitive from justice. If the dog, in fact, takes up and follows the trail of a known fugitive and finds him, or aids his pursuers to find him, there can be no mistake as to whether or not he is the party sought. His guilt or innocence of a given crime, however, should be established by

other evidence. Neither court nor jury can have any means of knowing why the dog does this thing or another, in following in one direction instead of another; that must be left to his instinct without knowing upon what it is based. The information obtainable on this subject, scientific, legal or otherwise, is not of such a character as to furnish any satisfactory basis or reason for the admission of this class of evidence. We agree fully with the statement in *Brott* v. *State, supra,* that the "conclusions of the blood-hound are generally too unreliable to be accepted as evidence in either civil or criminal cases." The admission of this evidence by the trial court was reversible error.

Over the objection of counsel for the plaintiff in error, Henry Geisel, an uncle of the plaintiff in error, was asked the following question: "After you saw those tracks,—the horse tracks or buggy tracks,—did you then reach any conclusion as to whether it was an accident or a crime?" He answered, "I did not." The witness was then asked if he knew William Peters, and if he did not say to him the day after the fire, "When I discovered those tracks it was just like sticking a knife into me." The answer was in the negative. Peters was then permitted to take the stand for the purpose of impeaching Geisel by stating that he (Geisel) did make such statement. The State was further permitted to ask Geisel, "Did you not say to Walter Heidbreder, during the week after the fire, that Charles A. Pfanschmidt had come to you and said he could do nothing with Ray; that the way Ray was carrying on it would break him; and that he asked you to speak to Ray, and said to you that whatever you might say to Ray it would not hurt his feelings?" The witness replied that he did not say this to Heidbreder. Heidbreder testified that Geisel had made such a statement to him. It is insisted that the questions and impeaching testimony were improperly admitted. The rule is that a witness may be impeached by showing that he has made contradictory statements, but he

cannot be thus impeached as to collateral matters. "Since the reason of the rule excludes witnesses whose testimony would introduce new issues over and above those which already might be entered into, the test of collateralness should naturally be, could the fact for which they are offered in contradiction have been shown in evidence for any purpose independently of this contradiction?" (1 Greenleaf on Evidence,—16th ed.—sec. 461*e;* Jones on Evidence,—2d ed.— sec. 827; 7 Ency. of Evidence, 78; 2 Wigmore on Evidence, chap. 34; *City of East Dubuque* v. *Burhyte,* 173 Ill. 553; *Moore* v. *People,* 108 id. 484; *Craig* v. *Rohrer,* 63 id. 325.) Under these authorities it is clear that the questions asked Geisel as to his feelings when he saw the horse and buggy tracks the morning after the fire were improper. Such statement, if he made it, was, in effect, his opinion as to the guilt of plaintiff in error. Such an opinion could not have been given in evidence by him for any purpose. Geisel had stated that the relations between the plaintiff in error and his father were amicable. This was material on the question of motive. His alleged statement to Heidbreder could have been shown in evidence by Geisel or anyone else who heard the statement which it is claimed was made by Charles A. Pfanschmidt, the father, hence it was properly admissible as impeaching testimony.

Plaintiff in error also objects to the introduction of a copy of a letter written by Henry C. Sprick, cashier of a bank in Quincy, to the father of plaintiff in error, on September 26, 1912. Sprick testified that about September 15, 1912, he had a conversation with plaintiff in error in regard to his overdrawing his account at this bank. He also testified that plaintiff in error had overdrawn it before that time and an overdraft existed at the time of the death of the father. It appears that the father had secured one of the overdrafts theretofore made by plaintiff in error and that an uncle had secured another. The letter referred to stated, in substance, that the writer was sorry to bother

him so often, but found it necessary to call his attention
to the fact that Ray had again overdrawn his account;
that they could not permit such continuous overdrawing
and would have to stop honoring checks unless provisions
were made in some way to stop it; that the writer wished
the father would talk with Ray and try to make him realize
that he must not check on the account unless he had funds
on hand, and asking him further to arrange for the pres-
ent overdraft as early as possible. There is no proof that
this letter reached the father except that which may arise
from the assumption that it would naturally have been re-
ceived by him in due course of mail on Friday, the last day
he was seen alive. There is no proof that there was any
communication between Ray and any of his family after
this letter was probably received. The theory upon which
it was introduced was that it tended to show a motive for
the crime, that the father and son were having trouble over
money matters, and that the father, on receipt of the let-
ter, would naturally communicate, by telephone or other-
wise, with his son as to its contents. In cases of circum-
stantial evidence any facts which tend legitimately to prove
or explain the facts and circumstances in issue can be con-
sidered, and the evidence of circumstances is permitted
to take a wide range and include everything that will aid
the jury in reaching a verdict. Much discretion is left to
the trial court as to the admission or exclusion of such
testimony. (12 Cyc. 477, and cases cited; *Miller* v. *Peo-
ple,* 229 Ill. 376.) Circumstances, however, may be so re-
mote as to have no legitimate influence in determining any
material issue. Testimony as to such remote circumstances
may tend to confuse and conceal the real issue rather than
aid the jury in determining the question presented to them.
(*People* v. *Razecicz,* 99 N. E. Rep. 557.) If this letter
had been received by the father and read by him in the
presence of a third party on the day before the homicide,
in the absence of plaintiff in error, under the authorities

such third person could not have stated, on the trial, its contents or told what the father said after reading it. (*Mc-Bride* v. *Commonwealth,* 95 Va. 818; *Pence* v. *Commonwealth,* 51 S. W. Rep. 801; *Wilburn* v. *State,* 77 id. 3; *Foster* v. *Shepherd, supra.*) If there had been proof that the·father had received the letter and talked with plaintiff in error a different situation might have been presented. The letter was improperly admitted.

The evidence is of such character as to plaintiff in error ever having anything to do with the dollar bill which the sheriff and detective testified they found at the bank several weeks after the crime that we think its admission tended to mislead and confuse the jury and should have been excluded.

The testimony as to the ax-head and the clock mechanism, while somewhat remote, we are disposed to think was properly admissible.

In rebuttal the State introduced testimony of the sheriff and another witness to the effect that they had set up, a short time before the trial, the tent owned and formerly occupied for sleeping purposes by plaintiff in error, in the same situation as when plaintiff in error was sleeping in it, and through the canvas of the tent experimented as to whether they could see the lights of the passing midnight train on the Burlington railroad. We are disposed to hold that the conditions of the experiment were substantially identical with those existing on Friday night, September 27, when plaintiff in error testified he saw the lights of that train. This being so, under the authorities such testimony was admissible. (*Hauser* v. *People,* 210 Ill. 253; 12 Am. & Eng. Ency. of Law,—2d ed.—408; 5 Ency. of Evidence, 482, and cases cited.) The difference in the conditions of the tent and in the opportunities of seeing the train at the time of this testimony and at the time the plaintiff in error claims he saw the lights of the train was such that

262   30

they would affect the weight of the testimony but not its competency.

It is further insisted by counsel for plaintiff in error that the court improperly admitted in evidence the suit of clothes found in the Frese vault; the testimony of Frese as to the oil can; the testimony of physicians and others as to the nature of the wounds on the body of Blanch Pfanschmidt; the nature of the instrument used in inflicting the wounds on the body of Miss Kaempen, and the admission of testimony of certain witnesses whose names are not on the back of the indictment. We have examined these points and find no prejudicial error in the rulings of the trial court.

It is further insisted that the court improperly gave certain instructions on behalf of the People and refused certain instructions asked by plaintiff in error. It is conceded by counsel for plaintiff in error that certain of the given instructions have been heretofore approved by this court. It appears that certain, if not all, of the refused instructions were practically covered by others given. Taking the instructions as a series, we think the jury were fairly instructed on the law as applied to the evidence in the record.

Plaintiff in error further insists that the court should have sustained his challenge to the array of the regular panel of jurors and to each of the final special panels, and should have granted a new trial on the showing made that six of the jurors who tried the case were not fair and impartial, as in their answers they made untrue statements touching their competency to serve. This last question is a most serious one but the conclusions we have reached on other questions render it unnecessary for us to discuss these.

The State's attorney, in his closing argument to the jury, stated that "Viehmeyer says he [referring to plaintiff in error] said to me, 'I am guilty, but God knows I am not to blame.'" It was objected that this statement was

not in evidence, and it is now conceded that no such testimony was introduced. The State's attorney then insisted that such testimony had been introduced and that he had it in his notes. The court refused to rule on the question. We have already held that the testimony as to the interview with Viehmeyer in jail was improperly admitted. Permitting the State's attorney to make this statement outside of the record added to the gravity of the injury of such admission. Other statements were made in the closing arguments of counsel for the State that were improper, but as in our judgment they will not occur on another trial we shall not extend this opinion by commenting on them. Moreover, we do not think there was any reversible error committed by the trial court as to its ruling in permitting special counsel to be associated with the State's attorney in the prosecution of this case nor in the order in which the closing arguments were made.

Counsel for plaintiff in error further insist that the evidence does not justify the verdict, while counsel for the State insist that the evidence shows that substantial justice has been done and that any errors of law committed in the admission or exclusion of testimony or in other rulings of the court will not justify a reversal of the case. We do not wish to express any opinion as to the evidence, except to say that it was of such a character that the rulings on the legal questions involved should have been accurate.

The judgment of the circuit court is reversed and the cause remanded, with directions to grant the motion for change of venue from the county, and for further proceedings not inconsistent with the views herein expressed.

*Reversed and remanded, with directions.*